Approved: _____
JAMES MCMAHON/DANIEL LOSS
Assistant United States Attorneys

Before:   HONORABLE LISA MARGARET SMITH
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - x
                                 :   17 Mag. 7351
                                 :
UNITED STATES OF AMERICA         :   SEALED SUPERSEDING
                                 :   COMPLAINT
                                 :
                                 :   Violations of
      - v. -                     :   15 U.S.C. §§ 78j(b) &
                                 :   78ff; 17 C.F.R. § 240.10b-5;
                                 :   and 18 U.S.C. § 1343
MICHAEL SCRONIC,                 :
                                 :   COUNTY OF OFFENSE:
      Defendant.                 :   Westchester
                                 :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

  KEVIN M. GONYO, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE

  From at least in or about April 2010 through at least in or about October 2017, in the Southern District of New York and elsewhere, MICHAEL SCRONIC, the defendant, knowingly and willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of facilities of national securities exchanges, in connection with the purchase and sale of securities, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, contrary to Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses

of business which operated and would operate as a fraud and deceit upon persons, to wit, SCRONIC made false and misleading representations by interstate wire communication regarding the performance of the Scronic Macro Fund (the "Fund") and used the investors' money for his own personal benefit and to pay redemptions to other investors.

(Title 15, United States Code, Sections 78j(b) & 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5)

## COUNT TWO

From at least in or about April 2010 through at least in or about October 2017, in the Southern District of New York and elsewhere, MICHAEL SCRONIC, the defendant, knowingly and willfully, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, SCRONIC made false and misleading representations by interstate wire communication regarding the performance of the Fund and used the investors' money for his own personal benefit and to pay redemptions to other investors.

(Title 18, United States Code, Section 1343)

The bases for my knowledge and the foregoing charges are, in part, as follows:

1. I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter. I have been a Special Agent with the FBI for about 17 months. I am currently assigned to a white-collar crime squad in the FBI's New York Field Office. Before that, I was employed as an accounting and finance professional for about seven years. I have received training regarding securities fraud and have been involved in several investigations relating to violations of the federal securities laws and related offenses.

2. This affidavit is based upon my review of documents and my interviews of witnesses. Because this Complaint is being

2

submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and statements of others are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## The Scheme to Defraud

3. Based upon my interviews of witnesses, information I have received from the Securities & Exchange Commission and my review of documents, such as documents provided by witnesses, public records, bank account and brokerage account statements and electronic communications between MICHAEL SCRONIC, the defendant, and investors and potential investors in the Fund, I have learned that:

    a. SCRONIC is a graduate of Stanford University and received a Master of Business Administration degree from the University of Chicago.

    b. SCRONIC has been operating the Fund out of his home in Westchester County, New York since in or about April 2010. He had previously been employed for about seven years at a large investment bank in New York where he served as an Executive Director on an equities trading desk. He left that job in or about 2005.

    c. Since April 2010, SCRONIC has engaged in a scheme to defraud Fund investors by misrepresenting the Fund's performance and by using investor funds for his personal benefit.

    d. In most cases, SCRONIC and the Fund's investors signed investment agreements. In those agreements, SCRONIC represented that the Fund invested in options. The agreements provided that SCRONIC's annual fee for acting as the Fund's investment advisor would be a maximum of 1% of the total amount invested in the Fund and 20% of the Fund's annual profits.

    e. Since in or about April 2010, SCRONIC has solicited and received approximately $19,750,000 from at least 45 investors, including a number of friends and acquaintances.

Several of the investors live outside of New York and some investors live outside of the United States.

  f. SCRONIC used interstate wires to execute his scheme. He frequently communicated with investors by email. In addition, the investors typically transmitted money to SCRONIC's personal bank accounts by wire transfer. SCRONIC then generally sent by wire at least a portion of the investors' money to a personal brokerage account he used to conduct trades on the Fund's behalf (the "Brokerage Account"). I have not seen any instance in which SCRONIC transferred funds he received from an investor to any investment or brokerage account other than the Brokerage Account.

  g. SCRONIC generally reported the performance of the Fund to its investors in writing on a quarterly basis and also provided performance figures to potential investors. He reported positive returns to some investors in all but one of the 22 quarters from January 2012 through June 2017, with the highest reported quarterly return being 13.4% in the fourth quarter of 2014. To other investors, he reported positive returns in all quarters between January 2012 and June 2017. The records of the Brokerage Account show that the Fund has had trading losses in each year of its operation. As of June 30, 2017, the Fund had net trading losses in 28 out of 29 quarters of operation, totaling an aggregate net loss of about $15.7 million before commissions. The Fund's only positive quarter was its first quarter of operation in 2010.

  h. SCRONIC provided most investors with quarterly account statements that purported to show the performance of the Fund. Beginning with the third quarter of 2012, SCRONIC's account statements also purported to show the value of the investor's share of the Fund. For each quarter, from October 2012 through June 2017, the total assets of the Fund reported by SCRONIC on these account statements exceeded the total assets held in all of SCRONIC's bank and brokerage accounts. For example, the account statements sent to investors for the quarter ending June 30, 2017 reported total Fund assets of about $21.7 million. The balance of the Brokerage Account at that time was only $27,376, while the combined balance of SCRONIC's brokerage and bank accounts totaled no more than about $102,376 at that time.

i. In addition to realizing losses on the Fund's investments, SCRONIC used investor funds for personal expenses in amounts exceeding the amounts of management fees he represented he would take in the investor agreements. SCRONIC's primary source of funds during this period was money he received from Fund investors. His other sources of income during this period, coupled with his liquid savings as of the start of 2012, totaled no more than $323,000. However, from January 2012 through August 2017, SCRONIC's personal expenditures totaled about $2.9 million, an average of more than $500,000 annually. SCRONIC's expenses included, among other things, monthly rent of $12,275 for his primary residence in Westchester County; mortgage payments on a vacation home at Stratton Mountain in Vermont; fees for multiple beach and country clubs, including a $30,000 payment to the Stratton Mountain Club in July 2017; and miscellaneous credit card charges averaging more than $15,000 per month.

j. In recent months, SCRONIC has been unable to raise a sufficient amount of new investor funds to enable him to pay redemptions requested by existing Fund investors. Between June 2017 and August 2017, at least four investors have requested redemptions from the Fund totaling about $1.5 million. The Fund's investment agreements required SCRONIC to pay redemptions within three business days. SCRONIC has failed to satisfy the redemption requests described above and has not had sufficient funds on hand to do so. Instead, he has, at various times, told the redeeming investors that the Fund would only pay redemptions at quarter end going forward; that he was too busy and preoccupied with a relative's medical condition to pay redemptions; and that he was unavailable to pay redemptions because he was on vacation. In some cases, SCRONIC has ignored redemption requests.

### "Victim A" Invests with SCRONIC

4. Based upon an interview with an investor, a review of documents provided by the investor, a review of bank and brokerage account records, and a review of electronic communications between MICHAEL SCRONIC, the defendant, and others, I have learned that:

a. On or about November 12, 2015, SCRONIC stated in an email to Victim A, a potential investor, "[W]hat's cool about

5

my fund is that I'm only in publicly traded options and cash so any redemptions are met within 2 business days so if you do need to withdraw for your business needs it will be quick and painless."

    b. On or about November 30, 2015, SCRONIC claimed in an email to Victim A that: a) the year-to-date rate of return for the Fund was 21%; and b) the rate of return for the Fund since inception in 2010 was about 18%. In reality: a) the year-to-date rate of return on trades was negative 90% before commissions; and b) the rate of return on trades since SCRONIC began soliciting investors in April 2010 was also negative.

    c. After receiving the false information from SCRONIC regarding the Fund's performance, Victim A invested $100,000 in the Fund in or about December 2015. Victim A transferred the money from his brokerage account to SCRONIC's personal bank account. SCRONIC then transferred the money to the Brokerage Account. These wire transfers were processed from the Southern District of New York through the Fedwire Funds Transfer System's facility in Texas and, therefore, were interstate.

    d. SCRONIC told Victim A on or about July 15, 2016 that the value of the Fund increased by 2.3% for the second quarter of 2016. In fact, during that quarter, the Brokerage Account had about $744,000 in net trading losses. Similarly, SCRONIC told Victim A on or about April 3, 2017 that the Fund was up 7.1% for the first quarter of 2017 when the Brokerage Account actually had net trading losses of approximately $681,000.

    e. Victim A invested another $100,000 in the Fund on or about June 21, 2017. On or about the same day, another investor invested $25,000. SCRONIC transferred $105,000 of these investor funds to the Brokerage Account but retained the remaining $20,000 in his personal checking account. On or about the same day, he made a purchase at Cartier of approximately $11,000.

    f. On August 8, 2017, Victim A requested a redemption of $200,000 of his purported $223,283 balance in the Fund as of June 30, 2017. Victim A requested that the redemption be processed within three days, as set forth in the investor agreement he signed with SCRONIC. From August 2017 through

September 2017, Victim A made several additional requests for the $200,000 redemption. SCRONIC offered a number of excuses for why he was not able to process the redemption request, including his vacation schedule and a relative's medical condition. As of October 2, 2017, Victim A had not received the money.

### "Victim B" Invests with SCRONIC

5. Based upon a review of bank and brokerage account records and a review of electronic communications between MICHAEL SCRONIC, the defendant, and others, I have learned that:

   a. Between about March 2014 and March 2017, Victim B invested a total of $2 million in the Fund.

   b. On or about October 8, 2014, SCRONIC told Victim B that his original $250,000 investment had grown to $263,285 as of September 30, 2014. In reality, the value of the entire Fund as of September 30, 2014 was no more than about $39,193. From the dates of Victim B's original investment, the Fund incurred more than $700,000 in net trading losses in the second and third quarters of 2014. SCRONIC stated in an email to Victim B that the Fund was "up 7.4% in Q3 2014," when in fact the Fund was down for that quarter.

   c. On or about December 11, 2014, SCRONIC told Victim B that the Fund had earned positive annual return of 21.7% in 2012 and 28.8% in 2013 and that the Fund had earned positive quarterly returns every quarter between the second quarter of 2012 and the third quarter of 2014. The Fund actually earned negative annual returns in 2012 and 2013 and was down every quarter in 2012, 2013, and 2014. On or about January 2, 2015, SCRONIC stated in an email to Victim B that the Fund was "up 14.3%" for the fourth quarter of 2014, which was also false.

   d. After receiving the foregoing false representations from SCRONIC regarding the Fund's performance, Victim B invested an additional $250,000 in the Fund between January 6, 2015 and January 8, 2015.

   e. On or about July 1, 2015, SCRONIC told Victim B that the Fund "finished up 5.2%" for the second quarter of 2015. The Fund had a negative rate of return during the second quarter

of 2015 and incurred more than $600,000 in trading losses during that period.

       f.   After receiving the above false representations from SCRONIC, Victim B invested another $500,000 in the Fund between September 30, 2015 and October 6, 2015.

       g.   On or about January 12, 2017, SCRONIC falsely told Victim B that his then $1 million in invested principal had grown to $1,197,576.

       h.   On or about March 21, 2017, Victim B invested another $1 million in the Fund. In turn, between March 21, 2017 and March 24, 2017, SCRONIC transferred $400,000 to the Brokerage Account and used at least some of the remaining $600,000 from Victim B's March 21, 2017 investment to pay redemptions to other investors in the second quarter of 2017.

### "Victim C" Invests with SCRONIC

6.   Based upon a review of bank and brokerage account records and a review of electronic communications between MICHAEL SCRONIC, the defendant, and others, I have learned that:

       a.   On or about March 7, 2017, SCRONIC told Victim C that the Fund had positive quarterly rates of return for every quarter in 2015 and 2016, ranging between 2.3% and 9.8%. The Fund had net trading losses during each of those quarters.

       b.   After receiving the above false information regarding the Fund's performance, Victim C invested $250,000 in the fund on or about March 31, 2017. SCRONIC used at least some of Victim C's money to fund redemptions to other investors totaling about $623,821 between March 21, 2017 and April 5, 2017. During those dates, SCRONIC also transferred $100,000 to the Brokerage Account.

       c.   On or about April 3, 2017, SCRONIC falsely told Victim C that the Fund was "[u]p 7.1% for Q1 2017." Victim C thereafter invested an additional $100,000 in the fund on or about May 8, 2017.

"Victim D" Invests with SCRONIC

7. Based upon a review of bank and brokerage account records and a review of electronic communications between MICHAEL SCRONIC, the defendant, and others, I have learned that:

    a. On or about December 24, 2016, SCRONIC told Victim D that the Fund was up 4.1% as of the end of the third quarter of 2016. The Fund had a net trading loss of about $692,000 in that quarter. When Victim D requested additional information about the Fund's performance, SCRONIC falsely told him that the Fund had a positive rate of return every quarter between the second quarter of 2012 and the third quarter of 2016.

    b. After receiving the foregoing false information, Victim D invested a total of $1 million in the Fund between December 29, 2016 and April 10, 2017. SCRONIC used at least some of the funds invested by Victim D to make an interest payment due on a personal loan and to pay redemptions to other investors. In some instances, SCRONIC would not have had sufficient funds available to pay the redemptions absent the funds he received from Victim D.

WHEREFORE, deponent prays that MICHAEL SCRONIC, the defendant, be arrested, and imprisoned or bailed as the case may be.

                                                _____
                                                KEVIN M. GONYO
                                                Special Agent
                                                Federal Bureau of Investigation

Sworn to before me this
3rd day of October, 2017

_____
HONORABLE LISA MARGARET SMITH
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK