**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**18 CR 43 (CS)**

_____

**UNITED STATES OF AMERICA**

**-against-**

**MICHAEL SCRONIC**
**Defendant.**

_____

**SENTENCING MEMORANDUM ON**
**BEHALF OF MICHAEL SCRONIC**

**BY:    Alexei Schacht, Esq.**
**Attorney for Michael Scronic**
**123 West 94th Street**
**New York, NY 10025**
**Tel: (646) 729-8180**
**Fax: (212) 504-8341**
**Email: alexei@schachtlaw.net**
**www.schachtlaw.net**

## TABLE OF CONTENTS

INTRODUCTION                                                                                  3

FACTS RELEVANT TO DETERMINING AND FAIR AND JUST SENTENCE          4

THE CORRECT LEGAL FRAMEWORK FOR SENTENCING ANALYSIS            11

THE SENTENCING GUIDELINES THAT APPLY IN THIS CASE                    13

THE DEFENDANT DID NOT EMPLOY SOPHISTICATED
MEANS IN COMMITING THIS CRIME                                                     13

ARGUMENT THAT A FAIR AND JUST SENTENCE WOULD
BE NO MORE THAN 36 MONTHS IN PRISON                                          15

A. THE COURT SHOULD GIVE LITTLE WEIGHT
TO THE ADVISORY GUIDELINES RANGE.                                             16

B. THE DEFENDANT SHOULD RECEIVE A NON-GUIDELINES
SENTENCE UNDER SECTION 3553(a) BECAUSE ONE FACTOR
THAT CONTRIBUTED TO HIS COMMITTING THE CRIME
IS THAT HE WAS A COMPULSIVE GAMBLER AT THE TIME
HE COMMITTED IT                                                                            18

C. THE § 3553(A) SENTENCING FACTORS IN TOTALITY SUPPORT
A NON-GUIDELINES SENTENCE OF NO MORE THAN 36 MONTHS.       20


CONCLUSION                                                                                   25

## INTRODUCTION

This Sentencing Memorandum is submitted on behalf of the defendant, Michael Scronic ("the defendant", "Mr. Scronic" or "Michael", herein) in connection with his sentence hearing that is scheduled for September 18, 2018 at 2:00 p.m. As discussed in detail below, we ask your Honor to sentence Michael to a non-Guidelines sentence of no more than 36 months in prison.

This case involves the tragic story of an accomplished person and once respected banker who descended into compulsive gambling; he lied to his friends, family and others and stole millions of dollars from them. Michael gambled away the vast majority of the money he stole in the stock market. He fully accepts responsibility for his crime and will regret for the rest of his life the harm he has caused to the victims, including some of his once close friends and his own mother. However, since Michael's arrest he has undergone tremendous personal growth and has put himself on the right path to being a more self-aware and changed person, unlikely to ever again commit a crime. Indeed, Michael is already again a productive member of society and there is every reason to believe that he will continue on that path after his incarceration is complete.

This Memorandum begins with a recitation of the case's relevant facts, turns to a discussion of the legal framework that we ask the Court to use in analyzing the case, and is followed by an argument about what we believe are the correct United States Sentencing Guidelines and then finishes with a discussion of the relevant sentencing factors and what type of sentence they augur.

**FACTS RELEVANT TO DETERMINING AND FAIR AND JUST SENTENCE**

The Defendant's Years in School and at Morgan Stanley:

As a child Michael was a high academic achiever, studying math at Stanford University and then getting an M.B.A. at the University of Chicago. Presentence Investigation Report ("Report" herein)(¶ ¶10, 56)1. Throughout Michael's high school and college years he gambled excessively on card and casino games and sports betting. His appetite for and  inability to control his gambling followed him to Wall Street which was like a "huge casino" and increased over time. (*See* Exhibit A, page 3, letter of Stephen Block).

There is every reason to believe that Michael's becoming a compulsive gambler was not a coincidence. In 2001, Michael's mother compulsively gambled away all of her husband's retirement savings (Michael's father) and this in turn led to their divorce (¶ 55). In addition, Michael's maternal grandfather was a compulsive gambler, according to his mother. So gambling was in the family DNA.

After business school, fascinated by numbers and risk-taking, Michael was employed at Morgan Stanley as a trader. It was there that he met his wife Ashley, whom he married in 2004 (they are now in the process of getting a divorce). The marriage produced one child, "MJ", who is now 6 years old.  The defendant's years at Morgan Stanley were mostly productive and lucrative. From 1998 until 2005 he made the bank many millions of dollars as a trader but in 2005 he lost about three million dollars in a proprietary account that he was trading for the bank. He was asked to leave that "desk" at Morgan Stanley and shortly thereafter left the firm altogether.

---

1 Parenthetical references, unless noted otherwise, are the paragraphs of the Report.

At about the same time, in 2005, Michael had his first mental hospitalization for depression. His shame at these problems caused him to hide these facts from almost everyone, including close family members such as his sister and parents. After he left Morgan Stanley he received a severance package and still owned a valuable apartment in Manhattan.

Life after Morgan Stanley/ Michael Borrows Five Million Dollars from a Friend:

From about 2005 to 2011 he traded his own money including his severance package. At first, he increased the several hundred thousand-dollar package to about $4 million but lost it all in the markets in only two weeks. Michael then lost all of his retirement savings and all of the approximately million dollars in proceeds from the sale of their condominium. In about 2012, he borrowed five million dollars from his college roommate at 11% annual interest. He gambled that money away in about 8 months by placing most of the money in extremely high-risk short-term put options. So before he obtained money from anyone by fraudulent pretenses, Michael lost all of his own money.

Michael Starts a Fund, Lies to Investors and Gambles away almost all of their Money:

In 2011, Michael started the Scronic Macro Fund. But this was really nothing more than a name. Michael operated out of his home and had no office nor any employees. He solicited money from possible investors, all of whom were friends or family members. Over approximately the next 7 years about 45 people invested about $24.5 million dollars[2] by wiring or writing checks to Michael's personal bank account. The "Fund" did not even have a bank

---

2 This number includes the $5 million loan that was not a part of the Scronic Macro Fund although certainly Michael lied repeatedly to the lender.

account. During that time period he lost over $20 million[3] of those dollars gambling mainly in ultra risky options trading. Michael would send regular emails to the investors detailing his thoughts and trading strategies. His trades did generally follow the strategies outlined in the emails.

However, he lied to investors about the returns, making fictional number in his emails about the balances he was holding on behalf of investors. For years he sent simple unsophisticated emails up until July 2017, such as the one attached as Exhibit B. Eventually in the Summer of 2017, had did send some false statements like the one attached as Exhibit C, with the investor's name redacted. But even this statement was hardly sophisticated.

During the seven-year period of the Fund Michael also used some of the investors' money to support his wife and his own life. However, the vast majority of the money was lost in what became increasingly frenzied options trading activity. Attached is a sample of two consecutive week's activity that shows that Michael was up about 1200% and then lost about 71% of the money in the account in put options that expired weekly (Exhibit D).


Michael Is Arrested and Hospitalized and Starts to Change his Life:

On about October 5, 2017 the FBI arrested Michael and he was charged with the crimes in this indictment. The defendant agreed to speak with the arresting agents and he confessed to them in detail, mentioning that he felt that he had crossed the line from investing to gambling.

Shortly after his arrest, and at the Court's recommendation, Michael went to NY-Presbyterian Westchester for a psychiatric evaluation and mental health care help. He was held there for seven days of observation and analysis; he then participated in the hospital's intensive

---

3 Michael also paid about $2,000,000 in redemptions to about 7 investors.

outpatient program and was diagnosed with, among other things, a gambling disorder. The hospital also referred him to James J. Hodel, LPC for outpatient care. He has been seeing Hodel since that time (¶68). Attached (Exhibit E) to this Memorandum is a letter by Hodel discussing his treatment of Mr. Scronic. Dr. Hodel, states that he suffers from a diagnosable gambling disorder and part of that was the delusion that "it would all work out."

Michael has also been consistently attending Gamblers Anonymous ("GA") and Alcoholics Anonymous ("AA")4 and Refugee Recovery meetings since his arrest (¶¶69-70, 74-75). Attached as Exhibit F is a letter from Lacey Browne of Refugee Recovery, which is a Buddhist-based path to recovery from addiction. Michael has told me that he has found these meetings helpful and his mentor, Lacey, testifies to his hard work and his acknowledgement of the "suffering [he] has caused."

Michael's Diagnosis as a Compulsive Gambler:

One theme from all of the professionals' letters about Michael is that he has been a compulsive gambler. NY-Presbyterian, Stephen Block (Exhibit A) and James Hodel (Exhibit E) agree on this point. Mr. Block is a credentialed problem gambling counselor and he documents a long history of disordered and compulsive gambling. *See* DSM-5312.31. In his examination of Michael, the defendant scored a "perfect" 9 out of 9 in the assessment/diagnosis. According to Block, Michael engaged in a "cycle of rationalizations" that allowed him to continue to gamble (and to steal).

---

4 At the time of his Probation interview the defendant was still in a state of denial about his alcoholism. Indeed, despite an arrest for drunk driving and another horrible incident in which he drunk drove a car (73-75) he was reluctant to admit to this problem despite the fact that he has been attending AA.

Dr. Marc Potenza of Yale University, an esteemed professor and board-certified psychiatrist with a sub-specialty training and certification in addiction psychiatry also examined Michael and concluded that he is a compulsive gambler. Dr. Potenza's letter stating his conclusions is attached as Exhibit G. Dr. Potenza's letter is significant not only because he diagnoses Michael as suffering from a "moderate to severe gambling disorder" but also because he points out that Michael's affect, the same one that seemed to have aggravated some of the victims, may be explained at least in part by alexithymia (*see* Exhibit G at page 27), a kind of dysfunction in emotional self-awareness and expression.

One important aspect of these experts' opinions about Michael is that they help to explain how he could have continually kept "chasing" his consistent losing stock market bets and persisted in the delusion that he could eventual dig his way out of the whole and make his victims whole. This explains how he could steal from his best friends and his mother. Michael believed he would hit it big in the options market and could repay everyone.


Michael Today as Seen by Others in Gamblers Anonymous:

Reading through the letters submitted on Michael's behalf has been a deeply moving experience. Letters submitted by members of Gamblers Anonymous on his behalf are grouped as Exhibit H.

The common theme is that he deeply regrets his criminal conduct and wants to make amends for it. In particular, Sponsor Glenn E stresses the importance to Michael of the key Steps that require making amends to those he has harmed. Significantly though, Michael is actually able to help others now, as opposed to harming them, as spoken to by Bruce R.

Growth and change are other themes. As Max H points out in his letter, Michael was

nervous and depressed at first but has improved over the months. All of these letters are heartfelt and sent by new friends with nothing to gain by embellishing.

Michael Today as Seen by Family and Friends, including some of his victims:

Even more powerful because of the length and nature of the relationships are letters submitted by family and old friends, grouped as Exhibit I.

Michael's father, Robert Scronic, writes about how he plans to live near the prison to support his son. This is emblematic of the family support he has. Michael and his father have been there for each other, just as Michael and his ex-wife cared for Robert when he was suffering from brain tumor. Even before his arrest, Michael is described by others as having had a desire to help others. This is stressed by Robert's brother, Michael's uncle, James Scronic, who wrote about the way Michael is compassionate and dedicated to helping others.

Michael's mother, Marianne Scronic, writes eloquently about her own father's compulsive gambling and what she believes is the classically delusional thinking that her son suffered from himself. Indeed, I found her letter noteworthy inasmuch as she does not even mention that she is a victim in the case as well, having been defrauded of the $50,000 that she invested with her son. I believe that this is because she thinks that her son really believed that he would make huge gains in the stock market and that he would then be able to pay all of the victim's back and then some. Though she acknowledges that he committed a crime, she knows her son and knows that he would not "steal" in the conventional sense of the word. Perhaps she too still suffers from some degree of delusional thinking as she, after all, has been described by Michael as a gambler herself.

Old friends, like Jared Lissauer, have noticed that Michael now works daily on his

rehabilitation and his desire to make restitution to his victims. Michael's cousin Marci Lange wrote of the fact that "generations" of their family have suffered from diseases of addiction. She noted that Michael is a caring person, having dropped everything to care for his own father when his brain tumor was discovered. Michael's cousin, Judy Ritacco, echoes the same thought, that Michael comes from a family of gamblers and while he was taking money from innocent victims he really had the insane idea that just one more big bet would win him the money to repay everyone and to make a profit himself. At the same time that Michael lied to and stole from his mother he was compassionate and caring toward his father. I cannot explain this; obviously people are complex.

Some friends try to analyze Michael's changes. According to his childhood friend, Aaron Sinnott, Michael changed in about 2011. This, of course, coincided with the early stages of the crime. Aaron noticed the change. He now notices that Michael is doing well and understands that the harm that he caused. Aaron, for one, is optimistic about Michael's future.

Sarah Webb notes in great detail how involved Michael was in in his son's life and the life the of the whole school community. Although at the same time, she notes that he had so much free time to devote to his son because he was defrauding others.

Maura Thibault wrote a moving letter about how well he treated her in the "male dominated" environment of a Wall Street trading floor and she too attests to his good nature, while at no time minimizing the seriousness of his crime.

Michael's old friend Bridget Byron, feels "horrible" for the victims but feels that the only way Michael could have lost so much money investing in an "up market" was because he was making "risky" betting choices that inevitably went bust. She appreciates many of the gifts Michael possesses, both as a mathematician and a teacher and feels that if he stays focused on

healing himself and his family and making amends to his victims, he will have much to contribute to the world.

Another remarkable aspect of the case is that even many of the victim impact letters include statements about how the victim thinks that Michael is a decent person or has a good core or essence. We include the letter of Michael Radcliffe, one of the victims who supports the defendant and affirms that he is a good person who will remain his lifelong friend. So too Chip Parsons, another victim and long-time friend, points out that "I truly believe that Mike has the qualities and abilities to positively impact society, especially underprivileged youth, and that Mike acting as a dedicated teacher and counselor" will accomplish that goal.

Also noteworthy is the letter of Jennifer Walsh. Her son has been a math student of Michael's and she talks with great emotion of Michael's confession to them of his legal and other troubles.

The changes in Michael are perhaps best expressed by his old friend Angel Fierro. Angel is also a friend of many of the victims and also has great sympathy for them. He believes that Michael has genuinely changed in the many months since his arrest and that those changes are all for the better and bode well for Michael's future.


### THE CORRECT LEGAL FRAMEWORK FOR SENTENCING ANALYSIS

"A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). The Court must consider each of the factors set forth in 18 U.S.C. § 3553(a) to make an individualized sentencing determination. *See United States v. Booker*, 543 U.S. 220, 245-46 (2005); *Gall v. United States*, 552 U.S. 38, 59 (2007). The Court should begin

by calculating the applicable Sentencing Guidelines range. However, "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). Rather than relying on the Guidelines, a sentencing court must make an individualized assessment as to the appropriate sentence based on the facts presented in light of each of the factors set forth in § 3553(a).

The Court may impose a non-Guidelines sentence based entirely on policy considerations, including disagreements with the Guidelines. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). This is particularly true when considering Guidelines that are not based on the Sentencing Commission's traditional empirical and experiential study. *See id*. at 109. Section 3553(a)(2) states that the purposes of sentencing are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

To determine a sentence that best comports with these goals, the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the kinds of sentences available; (3) the kinds of sentence and the sentencing range established in the Sentencing Guidelines; (4) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (7) the need to provide restitution to any victims of the offense. *See* 18 U .S.C. § 3553(a)(1), (a)(3)-(7). Under the statutory parsimony clause, the Court should order a sentence that is "sufficient, but not greater than necessary." But, as in all cases, the first step is to determine the correct advisory Guidelines range.

## THE SENTENCING GUIDELINES FRAMEWORK
## THAT APPLIES IN THIS CASE

As the Report states, the parties agree that the correct base offense level is 7 and upward adjustments are appropriate for there being more than 10 victims (2 levels), for the defendant being an investment advisor in a securities-related fraud (4 levels) and a loss of over $22,000,000 (20 levels). The parties further agree that a 3-level downward adjustment is appropriate because the defendant has accepted responsibility for his crime. This results in an adjusted offense level of 30. However, the Government believes that a 2-level upward adjustment for "sophisticated means" applies in the case. The defense believes that such as adjustment is inapplicable.

Therefore, the parties agree that the defendant's adjusted guideline level is either 32 or 30, depending upon whether the 2-level sophisticated means adjustment applies under USSG § 2B1.1(b)(*See* ¶ 6). Should the Court rule in favor of the Government, as recommended by the Probation Department, then the suggested Guidelines sentence range would be 121 to 151 months. Should the Court agree with the defendant on this contested issue then that range would be 97 to 121 months.

Michael's crime did not involve sophisticated means as that term is defined in the Guidelines and relevant case law.

## THE DEFENDANT DID NOT EMPLOY SOPHISTICATED
## MEANS IN COMMITING THIS CRIME

"Sophisticated means" are defined in Comment 9 to USSG § 2B1.1 as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Examples of such conduct include "hiding assets or transactions, or both, through the

use of fictitious entities, corporate shells, or offshore financial accounts." In **United States v. Faibish**, 2015 WL 4637013 (E.D.N.Y. 2015), the Court pointed out that this adjustment was employed in only 13.1% of 2B1.1 offenses in 2012; and the court ruled that that Mr. Faibish was not in that small group of defendants for whom the adjustment was needed to sentence him. The most recent statistics available for fiscal year 2017 show that this adjustment was only employed by sentencing judges in 15.2% of cases in the United States. *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY17.pdf. This case is not in that 15.2% of cases where the defendant employed particularly sophisticated means.

In **United States v. Hulse**, 989 F. Supp. 2d 1224 (M.D. Ala. 2013), the court ruled that the sophisticated means adjustment is intended to only apply to cases where the defendant is actively attempting to avoid law enforcement surveillance or investigation and not merely defrauding the victims. Those lies, the ones made to commit the crime, don't make the crime sophisticated; rather, the extra lies made to avoid apprehension and to conceal the crime's commission are what justify the adjustment.

So in this case Michael certainly lied repeatedly, both verbally and in emails, to his victims in order to trick and defraud them. He also created false account statements for some victims in order to commit and perpetuate the crime. But even these statements were "crude and sporadic" according to one victim (whose initials are D.B. and who wrote a victim impact letter to the Court). These poor homemade statements would never have escaped the FBI's notice (*See* Exhibit C, a copy of a false account statement provided by the defendant with the victim's name and address redacted). But these typed statements crude as they are were only used in four months out of the multi-year crime. The rest of the time Michael sent simple emails such as

Exhibit B with the victim's name and email address redacted. These were hardly the sort of documents that the Sentencing Commission would have called "sophisticated."

Moreover, Michael never created false companies or overseas bank accounts or used false identity cards, all of which are indicia of a scheme using sophisticated means. *Compare* ***United States v. Andrew Caspersen***, 16 CR 414 (S.D.N.Y. 2016)(Rakoff, J.) (the defendant employed sophisticated means to commit his crime: setting up bank accounts in the name of fake funds that were intended to resemble real funds; registering fake domain names and email accounts; misappropriating two of his employees' identifications to create fake identification documents; and unwittingly making an accomplice of a junior employee). Here, the defendant simply had money wired by the victims into his own personal account. He had no office and simply worked out of his home. As such, Michael's crime is more like two recent cases in this District both of which were found to *NOT* involve sophisticated means. *See* ***United States v. Charles Bennett***, 15 CR 20 (S.D.N.Y. 2016)(Taylor Swain, J.)(victims lied to about status of invested monies) and ***United States v. Hanae Park***, 16 CR 473 (S.D.N.Y. 2017)(Abrams, J.)(victims given false account statements).

Accordingly, the Court should find that the defendant did not employ sophisticated means in this case and that his correct suggested guidelines level is 30.

## ARGUMENT THAT A FAIR AND JUST SENTENCE WOULD BE NO MORE THAN 36 MONTHS IN PRISON

The advisory guidelines as we calculate them yield an overly harsh sentence for this first-time, nonviolent offender of at least 97 months in jail. This number is calculated without any consideration of the individualized factors of Michael's case, including his demonstrated deep

remorse, his efforts at rehabilitation and restitution since his arrest. In this way, this case illustrates the quintessential problem with the fraud guidelines and highlights why so often in fraud cases courts downwardly vary under Section 3553(a).

Independent of the guidelines therefore, this Court has the exceedingly difficult task of determining what term of imprisonment sufficiently, without being greater than necessary, accomplishes the sentencing objectives of 18 U.S.C. § 3553 – namely, retribution, deterrence, rehabilitation, and restitution to the victims. With these goals in mind, Mr. Scronic's case is extraordinary in several respects and in each way militates in favor of a shorter sentence than that recommended by the guidelines.

A. THE COURT SHOULD GIVE LITTLE WEIGHT
TO THE ADVISORY GUIDELINES RANGE.

The advisory Guidelines recommend for this first time, non-violent offender a staggering range of between either 97 to 121 or 121 to 151 months' imprisonment depending upon whether the court finds that the defendant employed sophisticated means to commit the crime. The Probation Department, recommends a sentence of 84 months, about a 30% reduction below the bottom of the advisory range as calculated by the Probation Department. Yet even this recommendation – based on the fact that the defendant has never been in trouble before and is unlikely to be a recidivist - does not account for what I strongly believe to be several significant facts in the case including the fact that the defendant's compulsive gambling contributed to his decision to commit the crime at the time he committed the crime and his extraordinary efforts at post-arrest rehabilitation.

The Probation Department is correct to recommend a non-Guidelines sentence. And a

30% reduction in what we believe to be the correct bottom of the Guidelines range of 97 months would result in a 68-month sentence.5 But we urge your Honor to sentence Michael to less than that.

In fraud cases the Guidelines are driven nearly exclusively by one factor, and one factor only: the loss amount. As the Second Circuit recently recognized and has been recognized by judges in our Circuit, because the Guidelines rely so heavily on loss amount—an imprecise and wholly imperfect measurement of culpability—they deserve far less deference than other Guidelines provisions that are based on more sound policy rationale. In ***United States v. Algahaim***, 842 F.3d 796 (2d Cir. 2016), the Second Circuit has now invited district judges to consider non-guideline sentences in all fraud cases because, unlike other guidelines provisions grounded in empirical science, the fraud guidelines are decidedly less useful.

In ***Algahaim***. the Second Circuit endorsed what district judges rightfully and repeatedly have recognized in this district — the fraud guidelines are deeply flawed. *See also **United States v. Gupta***, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012) (fraud guidelines are "plucked from the thin air [and] appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology."). In light of the criticism surrounding the fraud Guidelines, courts in this District have often given non-Guidelines sentences in fraud cases. For instance, Judge Rakoff employed an 11-year downward variance in ***United States v. Andrew Caspersen***, 16 CR 414, a Ponzi scheme that resulted in an over-$45,000,000 loss amount. In ***United States v. Trebitsch***, 15 CR 450 (S.D.N.Y. 2015)(Broderick, J.), Judge Broderick cut the Guidelines by

---

5 The Probation Department seems as if they may have recommended a larger reduction in sentence had Michael expressed more remorse for the victims (*see* page 27 of the Report) even though the Report acknowledges that then defense counsel prevented the defendant from discussing the offense and despite that he "expressed remorse" (¶30)

more than half from a 51-63 month advisory guidelines range to a 24-month term of imprisonment in a Ponzi scheme offense with losses between $2.5 and $7 million.

Of course, every case is different but Mr. Scronic's case presents facts and circumstances that cry out for a non-Guidelines sentence.


B. THE DEFENDANT SHOULD RECEIVE A NON-GUIDELINES SENTENCE UNDER SECTION 3553(a) BECAUSE ONE FACTOR THAT CONTRIBUTED TO HIS COMMITTING THE CRIME IS THAT HE WAS A COMPULSIVE GAMBLER AT THE TIME HE COMMITTED IT

In *United States v. Liu*, 267 F. Supp. 2d 371 (E.D.N.Y. 2003)(Weinstein, J.), the Court found that a pathological gambling disorder may constitute diminished capacity under U.S.S.G. § 5K2.13, justifying a downward departure of four levels.  *Liu* contains a detailed discussion of the fact that a compulsive gambler's diminished capacity may warrant departure even though the defendant still had an appreciation that his fraudulent conduct was certainly wrong. In other words, the diminished capacity need not undermine the defendant's guilt or negate an element of the crime providing a defense to the charges. In this case, the parties are prevented from seeking departures but we ask the Court to use the rationale in *Liu* as a basis for imposing a non-Guidelines sentence.

The evidence that Mr. Scronic has suffered from being a pathological gambler is overwhelming:

- When he was arrested he told the FBI agents that he gambled away most of the money he stole;

- Following his arrest he was sent to NY-Presbyterian Westchester where independent clinicians diagnosed him with, among other things, a gambling

disorder; they then referred him to James J. Hodel, LPC;

- Dr. Hodel also diagnosed Michael with a gambling disorder;

- New York State Credentialed Gambling Counselor Stephen Block 6 also determined Michael as having a diagnosis of "disordered gambling";

- Dr. Marc Potenza diagnosed Michael as suffering from a "moderate to severe gambling disorder" and alexithymia.

So Michael, having left Wall Street and lost a large amount of his own money felt that he had to keep gambling in the stock market to get it back and to make money; and so he borrowed money and lost that money and lied about it and he then continued to lie and lie some more. But all the while he really believed that he could recoup his massive losses. This is the crux of the pathological gambler's mental problem. Michael really thought that he could win back the money. This is not a defense to the charge mind you; he lied and stole money. Investigating the case I was struck by a white board he kept in his home office (a photo provided in discovery is attached as Exhibit J). This shows on the upper right quadrant of the board how on September 29, 2017, Michael had about $100,000 and he projected that he could increase that money by options trading, having it double about every two weeks, until around the time of Thanksgiving, two months later, he would have over 25 million dollars! This was the pure fantasy of a compulsive gambler.  Michael lied and stole but did so under the delusion that he would win it all back and that it would "all work out" and no one would be harmed.

For sentencing purposes an apt comparison is the case of **United States v. Andrew Caspersen**, which was also referred to above in our argument that Mr. Scronic did not employ

---

6 Notable is that Block is the same expert upon whom Judge Weinstein relied in his decision in **Liu**.

sophisticated means in committing the crime. In **Caspersen** the defendant did employ sophisticated means and stole over $45 million and received a sentence of 48 months in part because he was a compulsive gambler. In this less sophisticated crime with a much lower loss amount there is every reason for Michael to receive a lower sentence than Mr. Caspersen.

In sum, because Mr. Scronic's compulsive gambling addiction was a major contributing factor to his having committed the crime the Court should downwardly adjust his sentence accordingly.

## C. THE § 3553(A) SENTENCING FACTORS IN TOTALITY SUPPORT A NON-GUIDELINES SENTENCE OF NO MORE THAN 36 MONTHS.

Independent of the guidelines, this Court must determine what sentence sufficiently, without being greater than necessary, accomplishes the sentencing objectives of 18 U.S.C. § 3553; namely, ensuring restitution to the victims, providing for defendant's individualized needs, and securing deterrence, incapacitation, and punishment.

*A RELATIVELY SHORT PRISON SENTENCE SATISFIES THE NEED*
*FOR PUNISHMENT, SPECIFIC DETERRENCE AND INCAPACITATION*

A multi-million dollar Ponzi-like scheme that victimized his friends and family – is a very serious crime that Michael committed. He is the first to acknowledge this. And, he recognizes that punishment is in order. But in this connection, Michael does not need many years behind bars to reflect on the seriousness of his offense or to punish him for his conduct. He has done both on his own. He has lost his wife and now sees his beloved son much less often, even now before he goes to jail. But he has retained the support of many.

Indeed, the letters submitted on his behalf are notable in that he seems to have told so

many people that he will be sent to prison for his crime and that he deserves punishment for it. In other words, unlike many defendants in criminal cases, he does not now suffer from denial that he will be incarcerated nor does he think that he should not be incarcerated. This is unusual, in my experience, in non-violent cases where so many defendants have unrealistic fantasies of non-incarceration sentences. So in that vein a long sentence is not needed to specifically deter him from re-offending. He knows what damage he has wrought and will not reoffend. The Probation Department states as much in its sentence recommendation writing that he poses a low risk of recidivism (*see* page 27 of the Presentence Report). As such, the Court need not impose a lengthy sentence to accomplish specific deterrence. Likewise, because he is unlikely to commit crimes again he is similarly not in need of incapacitation to protect the public from him.

It is hard to imagine many defendants who are less likely to recommit this – or any – offense. Moreover, Mr. Scronic has spent nearly the last year since his arrest examining the problems in his life – his problems, what went wrong for him and how to ensure it never happens again.

Michael and I have read the victim impact letters and they leave a strong impression. The victims' anger and desire for punishment leaps off of the page and is understandable. Michael fully grasps it. He lied to and betrayed many people, all of whom liked and trusted Michael. For them the experience has no doubt been awful and painful. But the Court should not sentence him based upon the degree some of the victims' anger but upon the factors that the law requires the Court to consider. And I believe that we have presented ample evidence to the effect that Michael is sincere in his remorse and that he was a compulsive gambler whose conduct is understandable (*NOT* justifiable) in light of that diagnosis. Moreover, he was abusing alcohol at the same time that he was "chasing" his losses in an attempt to recoup each new loss.

This chasing concept is discussed in detail in Stephen Block's letter (Exhibit A); Michael did not set out to trick people and steal their money. The crime began by him losing a huge loan that a friend gave him and it continued with insane attempts to get the money back.  Of course, he used some of the money, on his family's expenses. But this conduct is consistent with the fact that he felt any change in his outward appearance would cause his innocent wife or the victims to suspect that something was wrong. This in turn trapped him, he felt, into continuing to keep up appearances until he could gamble his way out of trouble.

As the above factual summary of the case and my client's life makes clear, we hope, Michael has spent a lot of time and effort looking at himself and trying to come to drips with why and how he lied to friends and family and stole their money. I believe that the letters strongly attest to the success of his efforts at positive change.


*REHABILITATION AND RESTITUTION*

As the above has, we hope, demonstrated, Michael struggles with immense remorse but he is deeply committed to his own recovery and rehabilitation. It is not hyperbole to write that Michael's every moment is consumed by it.

As detailed above and in the Probation Report, Michael now religiously attends G.A. and A.A. meetings, Refugee Recovery group meetings and individual therapy sessions. He devotes himself to his son, and works as a teacher and tutor. In sum, he leads a totally different sort of life than when he was consumed with making money and risk taking in the financial markets. This new approach to life seems to be working. According to his therapist, James Hodel, Michael has made much progress. This conclusion is echoed in the many letters submitted on his behalf.

Nor should this come as a surprise, as the gambling experts who weighed in about

Michael wrote that diligent and serious attendance at G.A. and other recovery meetings, combined with therapy and a new outlook on life, make real serious life change possible.

Michael's own letter to the judge is heartfelt and is an attempt to convey both his remorse and his hopes for the future (*see* Exhibit K). His improved attitude has helped to stop him from plunging himself into despair because of his crime, something he might have done in the past. Instead, he is confronting his problems head-on and trying to make amends in whatever ways possible. Toward that end, he has done what he has been able to help make restitution to the victims.

As is outlined in the Probation Report the defendant has consented to the forfeiture of a piece of property in Pawling, New York and a condominium in Vermont. As recently as two weeks ago he and I facilitated the United States Marshal's Service's entry to appraise and examine the property. Finally, the defendant was in possession of over $24,000 worth of the victims' money in his trading account that was not seized by the Government and which he turned over to me to be provided to the Government as partial restitution. Of course, he does not deserve a medal for making this restitution that only provides a small percentage of the victims' stolen money. But not all defendants in his shoes are so cooperative and I mention this mainly to show just another small way in which he is behaving differently than in the past and showing sincere efforts to make amends, as attested to by so many in their letters. Once he is out of prison Michael will be able to put his considerable abilities to work and one byproduct of that work is that he will be able to continue to make restitution to the victims. How much he will be able to make is impossible to say but it is possible to say that he will do his best.

As pointed out in the Report, Michael has been working as a tutor and teacher and was even accepted to the prestigious New York Teaching Fellows Program and he deferred

participation in it. The point being that he is able to make money and to really contribute to society without working on Wall Street. So now Michael receives positive feedback and gratification from students and their parents and not by receiving a bonus check.

In sum, Michael has spent, and continues to spend, every day on achieving the goal of rehabilitation. When he is in jail, and afterward, I am confident that if Michael continues along the path that he is on he will certainly achieve the goal of rehabilitation and he will lead a normal and productive life.

*GENERAL DETERRENCE*

General deterrence of other people who might consider committing a similar crime is a necessary component of any system of justice. Of course, it is impossible to know what sentence might deter some hypothetical person, especially since most people who commit crimes do not plan on getting caught or rationally analyze the pros and cons of their actions. Nonetheless, for those people that do weigh possible outcomes we believe that a sentence of several years in jail would be enough to deter them. A person anticipating the consequences of their actions in committing a financial fraud would surely be deterred by a sentence of say, 3 years.

Three years in prison, for example, is the length of time a person might attend law school. That is a long period of time. Prison, as the Court is aware, is a lonely, boring, humiliating, sometimes dangerous, place to be. The everyday indignities of strip searches, communal showers, count time, arguments over scraps of horrible food are awful; perhaps they are designed to be.

In any event, Mr. Scronic will be punished and anyone with a lucid mind who might be deterred from committing a similar crime would likely be deterred were she to know that she

The Honorable Cathy Seibel
September 4, 2018
Page 25 of 25

might get 3 years in prison.

## CONCLUSION

Michael Scronic committed an incredibly serious crime that harmed many people, including once close friends and even his own mother. He lied and stole. He deserves to be punished. But the Court will fashion a sentence that achieves the goals of justice and fairness and not one that simply metes out revenge. Based upon all of the facts and circumstances present in the case a sentence of no more than 36 months is fair, just and reasonable.

Yours truly,

/s/ Alexei Schacht

BY:    Alexei Schacht, Esq.
Attorney for Michael Scronic
123 West 94th Street
New York, NY 10025
Tel: (646) 729-8180
Fax: (212) 504-8341
Email: alexei@schachtlaw.net

cc:    A.U.S.A. James McMahon (by ECF)