# Stephen Block

Assessment and Evaluation

The purpose of this report is to assess and evaluate the gambling history and behavior of Mr. Michael Scronic (dob: 10/01/1971), currently residing at 156 East 85th Street, Apt. 3C, New York, NY 10028

Widely accepted gambling assessment tools and a narrative interview were utilized to determine Mr. Scronic's pattern of gambling and whether a diagnosis of *Disordered Gambling (DSM-5 312.31)* could be applied to him.

Interview

The interview with Mr. Scronic was conducted in my office at 19 West 34th Street, New York, NY 10001 on May 30, 2018.

Qualifications of Evaluator

I have worked with problem gamblers for over 37 years, accumulating in excess of 30,000 gambling specific treatment hours. For many years I worked at the Gamblers Treatment Center, an outpatient program administered by St. Vincent's Medical Center and more recently by Richmond University Medical Center in New York City. I also worked for the SAFE Foundation, a privately operated, state licensed addiction treatment program in Brooklyn, NY, where I developed the gambling treatment track. I am a founding member and current President of the New York Council on Problem Gambling, an organization dedicated to raising public awareness about problem gambling across New York State. I have conducted seminars and presentations throughout the United States on this issue and have trained other treatment professionals seeking certification. In addition to working with voluntary clients, I continue to work with the Legal Aid Society, Federal Defenders Office, New York State Department of Probation, Division of Parole, and the United States Pretrial Services and United States Probation and Parole District in the Eastern and Southern Districts of New York evaluating their clients. The Honorable Jack B. Weinstein, Senior District Judge, Eastern District of New York, under Rules 702, 703 Federal Rules of Evidence, acknowledged me as an expert witness (U.S. v Liu) in November, 2003. I have testified and submitted over 250 evaluations in the Federal Districts of New York, New Jersey, and Maryland as well as state courts in New York and New Jersey. I hold the following current credentials and certifications:

Credentialed Problem Gambling Counselor (New York State OASAS Credential #2)
International Certified Compulsive Gambling Counselor – Level II (NCPG #314)

# Stephen Block

Gambling History
Mr. Scronic related that both his grandfathers had addiction histories. His paternal grandfather was an alcoholic and his maternal grandfather was a horse player whose gambling contributed to the separation of the family. His mother and two siblings went to live with their older sister, while the older siblings were placed in foster homes. Mr. Scronic also reported that his uncle and cousin had significant gambling histories. Most telling was that Mr. Scronic's parents divorced when his mother lost his father's retirement savings in risky investments. He attributes this loss as a contributing factor in their split. Family history of gambling problems is a predictor of future gambling problems in the younger generation.

In the fall of 1986, as a freshman in high school, he started gambling on football, making picks from a sheet distributed by a classmate. After a few weeks, Mr. Scronic and friend decided to distribute the sheets themselves. For three weeks or so they were successful and then when a fellow student picked 11 out of 12 winners, they were unable to pay and their short careers as bookmakers ended. Early involvement in gambling activities is another predictor of problem gambling. Most adult males who develop disordered gambling issues begin gambling in their teen years.

When he turned 21, while at Stanford University, Mr. Scronic began to make trips to the casinos in Lake Tahoe and Reno, Nevada. Since he didn't have a car, he had to convince friends to drive there. He played blackjack and remembers going broke every time. He recalls being unable to go on a planned spring break trip because he lost all his money gambling. "I felt like a total loser."

After graduating college, Mr. Scronic secured a job in investment banking in New York City. Still without a car of his own, he would plan Atlantic City casinos trips every 6 months or so and convince a friend or two to join him on the bus. He remembers at least two instances when he was upset at the amount of money that he lost. He was also upset with his inability to stop. His friends would leave when the bus made its scheduled departure, but he stayed to try to win back his losses. He would return to the city, many hours later, broke and alone.

In the summer of 1996, he traveled to New Zealand and Australia with a friend. His friend left after 2 weeks and Mr. Scronic stayed for another 4 weeks. Once he was alone, he ditched his itinerary and spent the remainder of his stay playing blackjack at the casinos in Darwin and elsewhere. Even though he recalls that he was winning, he regrets that he chose to gamble instead of completing his planned travel, particularly not going to Tasmania.

From September 1996 until June 1998, Mr. Scronic attended business school in Chicago. He relates that he finally had a car and was able to travel the short distance to Gary, Indiana and the casinos on a regular weekly basis. He recalls that on his last

## Stephen Block
---

last night in Chicago, he traveled alone, once again to the casino, lost a few thousand, and maxed out his bank account. Instead of meeting with friends for a farewell, he spent his last night alone, gambling.

After business school he was hired by Morgan Stanley and for the next seven years worked as the head of the ETF Desk. His job entailed making risk markets and trading all day long. "Some days we lost millions and some days we made millions." "It was one huge casino in every way. During the day, we often bet on how many donuts junior people could eat in 10 minutes or how long someone's lunch break would be. Betting was constant."

During this time, Mr. Scronic started to go to the Atlantic City casinos on overnight trips. He would be comped for the rooms and restaurants. It is a common practice for the casinos to incentivize "good customers" with perks. He recalls losing almost always and maxing out his bank account on those occasions. "I was doing so well at work that these losses never crushed me." It was during his time at Morgan Stanley that he began to play poker with co-workers on a regular basis. He also started playing golf, and although he characterizes himself as a "terrible golfer," there was always money bet on the game.

When he left Morgan Stanley in October 2005, he began trading for himself funded by his severance package. He would trade foreign exchange, commodities and bonds as these worldwide markets were available 24/7. He worked long hours and made money. From late 2007 to early 2008 he made approximately $5 million. In 2008 when the markets turned downward, he began to "chase" his losses and made riskier and riskier bets, often on options. As is the case with most problem gamblers, Mr. Scronic exhausted his own assets before he began using other sources of funding. Some examples of this are indicative of the lengths Mr. Scronic went to "chase" his losses. He converted his IRA account into a margin account and in 2 weeks lost $250,000. He sold his apartment for $2.3 million and after telling his wife that he would only use $200,000 as trading capital, he lost it all. Another example of his chasing behavior was the personal loan he took from his college roommate; $5 million at 11% interest. It was irrational to believe that he could cover an 11% interest rate at that time. He lost that $5 million over the course of the next year, and his poor decision-making continued in an effort to get back the $5 million to repay the loan. In my professional opinion, his chasing behavior and his efforts to conceal the extent of his gambling activities were consistent with the mental state of the disordered gambler.

Gambling is an Addiction

In 2013 The American Psychiatric Association (APA) formally recognized disordered gambling as an addiction, grouping it together with substance use under the classification "Substance-Related and Addictive Disorders," Diagnostic and Statistical Manual of Mental Disorders (*DSM-5 312.1).* This new classification followed more than two decades of study and deliberation, representing a modification from gambling's prior classification as an impulse-control disorder. As an addiction, disordered gambling is now understood to be a physiological as well as psychological condition with observable manifestations in the human brain chemistry. As the article linked in the footnote 1 explains, the biology and behavior of disordered gambling and drug addiction are virtually identical, with clear patterns in the production of dopamine, serotonin and other neurotransmitters:

> The APA based its decision on numerous recent studies in psychology, neuroscience, and genetics demonstrating that gambling and drug addiction are far more similar than previously realized. Research in the past two decades has dramatically improved neuroscientists' working model of how the brain changes as an addiction develops. In the middle of our cranium, a series of circuits known as the reward system links various scattered brain regions involved in memory, movement, pleasure and motivation. When we engage in an activity that keeps us alive or helps us pass on our genes, neurons in the reward system squirt out a chemical messenger called dopamine, giving us a little wave of satisfaction and encouraging us to make a habit of enjoying hearty meals and romps in the sack. When stimulated by amphetamine, cocaine or other addictive drugs, the reward system disperses up to 10 times more dopamine than usual.

> Research to date has shown that pathological gamblers and drug addicts share many of the same genetic predispositions for impulsivity and reward seeking. Just as substance addicts require increasingly strong hits to get high, compulsive gamblers pursue ever riskier ventures. Likewise, both drug addicts and problem gamblers endure symptoms of withdrawal when separated from the chemical or thrill they desire. And a few studies suggest that some people are especially vulnerable to both drug addiction and compulsive gambling because their reward circuitry is inherently underactive – which may partially explain why they seek big thrills in the first place.[1]

A number of studies, including a study from the Yale University School of Medicine entitled *Brain Activity in Pathological Gambling,* exemplify the compelling science of gambling addiction, demonstrating brain changes through magnetic imaging that correspond to the cycles of reward, gratification, and other human responses.[2] A collection of such research has been compiled by the National Center for Responsible Gambling and is linked in footnote 2, below.

---

[1] http://www.scientificamerican.com/article/how-the-brain-gets-addicted-to-gambling/
[2] http://www.ncrg.org/sites/default/files/uploads/docs/monographs/ncrgmonograph6final.pdf

# Stephen Block

Gambling Assessment

Mr. Scronic was assessed by me for disordered gambling utilizing the prevailing assessment tool. The DSM-5 Disordered Gambling Assessment was administered to Mr. Scronic with the following result. Mr. Scronic scored 9/9 where a score of 4+ would indicate a diagnosis of Disordered Gambling (DSM-5 312.31). The specifiers for Mr. Scronic are as follows; *Persistent:* experiencing continuous symptoms, to meet diagnostic criteria for multiple years; *In early remission:* none of the criteria for gambling disorder have been met for at least 3 months but for less than 12 months; and *Severe:* 8-9 criteria met. The screening questions address the nine diagnostic criteria indicated in the DSM-5 to confirm diagnosis of Disordered Gambling.

The clinical indicators are:
1. Preoccupation: Is often preoccupied with gambling (e.g., having persistent thoughts of reliving past gambling experiences, handicapping or planning the next venture, thinking of ways to get money with which to gamble).
2. Tolerance: needs to gamble with increasing amounts of money in order to achieve the desired excitement.
3. Repeated unsuccessful attempts to cut back or stop gambling.
4. Restlessness and irritability when attempting to cut back or stop.
5. After losing money, often returns to get even (chasing behavior)
6. Lies to conceal extent of gambling.
7. Gambles when feeling distressed (e.g., helpless, guilty, anxious, depressed).
8. Relies on others to provide money to relieve a desperate financial situation caused by gambling.
9. Jeopardized or lost significant relationships, job or educational opportunities because of gambling.

Narrative Support of positive answers of DSM-5 assessment:

    1. Preoccupation: Mr. Scronic spent many hours thinking about gambling, participating in gambling and trying to come up with money to continue his gambling activities.
    2. More and more money, time and energy were required to sustain his gambling behavior.
    3. Mr. Scronic made a number of unsuccessful attempts to cut back or control his gambling but was unable to sustain that effort.
    4. Mr. Scronic's early gambling was social in nature, a shared activity with friends. When confronted with the prospect of cutting back or stopping his gambling, his mood changed and he became restless and irritable.
    5. Chasing behavior is a unique feature of gambling addiction. Gamblers continue to gamble to "get even" and to provide money for future wagers. This activity provided an element of fun and excitement. As his gambling progressed and he started to lose heavily, he felt a need to get even and gamble even more. It was no longer strictly enjoyable or exciting; there was a compulsion to win back his losses.
    6. Mr. Scronic made every effort to conceal the extent of his gambling from family, friends and business associates. He would minimize the amount of betting. In the end, of course, these efforts proved futile. His friends and family weren't fooled. They eventually knew it was for gambling.
    7. Mr. Scronic gambled in part to escape the problems created by previous gambling episodes. This paradoxical behavior is common with disordered gamblers. They believe, irrationally, that gambling more can solve the problems created by gambling.
    8. After exhausting his assets and available credit, Mr. Scronic went to friends and family and borrowed to sustain his gambling activities.
    9. Mr. Scronic has jeopardized his career, his reputation, lost his assets and potentially his freedom because of his gambling behavior.

Assessment Conclusions:

The results of this assessment indicate that Mr. Scronic satisfies the DSM-5 diagnosis of Disordered Gambling (DSM-5 312.31) with a specification of persistent, in early remission, and severe. Persistent specifier is indicated if gambler has experienced continuous symptoms to meet diagnostic criteria for multiple years, in early remission is indicated if these criteria have not been met for 3 to 12 months, and severe if 8 or 9 criteria are met. His behavior is indicative of the persistent, progressive nature of disordered gambling. His gambling history demonstrates the need to gamble to fulfill the underlying need for "action." He continued to gamble despite the consequences and the fear of disclosure of his activities. Mr. Scronic has experienced impaired judgment and

diminished insight as a result of his gambling behavior. Disordered gambling is classified as a behavioral addiction and Mr. Scronic's gambling history is consistent with and indicates an inability to control his impulse to gamble. This lack of control <u>contributed significantly</u> to his behavior and the negative consequences of his behavior.

Specifically, as with addictive behaviors generally, Mr. Scronic engaged in a cycle of rationalizations that enabled him to feed his addiction while blocking out the negative consequences. The anxiety of risk is present, but managed and insufficient to overcome the compulsion.

Mr. Scronic has been attending Gamblers Anonymous meetings on a regular weekly basis since November 2017. In addition, he is being treated by a private therapist, Mr. James Hodel.

<u>Recommendations:</u>

Mr. Scronic would benefit from continued and uninterrupted professional treatment and self-help meetings to continue with his progress in recovery. Research has shown that the efficacy of positive treatment outcomes is greatly increased when such treatment is consistent, long term and completed. It should be noted that gambling is rampant in most prison settings, presenting an obvious threat to those in addiction recovery. There is no gambling specific treatment available in federal correctional institutions. Only a handful of federal correctional facilities have any Gamblers Anonymous meetings and they are sporadic at best.  Ongoing treatment greatly reduces the risk of relapse which in turn is a key factor in lowering the rate of recidivism. U.S. Pretrial Services and U.S. Probation recognize the benefit of consistent gambling treatment for those persons under their supervision. It is important for disordered gamblers to gain and maintain insight into the connections between their gambling behavior and the consequences of such behavior. This is best accomplished in a treatment regimen combining psychotherapy, Gamblers Anonymous meetings, and daily constructive engagement. Mr. Scronic has also benefitted from the close support of his family. In my experience, recovery efforts are greatly enhanced by the supportive atmosphere provided by the family setting. Any change in the family dynamics would further compromise his recovery efforts.