UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA  :

                          :

        - v. -        :      18 Cr. 43 (CS)

                          :

MICHAEL SCRONIC,  :

                          :

            Defendant.  :

- - - - - - - - - - - - - - - -X

## GOVERNMENT'S SENTENCING MEMORANDUM

GEOFFREY S. BERMAN
United States Attorney for the
  Southern District of New York
Attorney for the United States
  of America

James McMahon
Daniel Loss
Assistant United States Attorneys

- Of Counsel -

TABLE OF CONTENTS

I.      Introduction....................................... 1

II.     The Offense Conduct............................... 2

        A.   The Scronic Macro Fund...................... 2

        B.   The Defendant's Fraudulent Conduct.......... 4

        C.   The Defendant's Post-Arrest Statement....... 7

III.    Application of the Relevant
        Section 3553(a) Factors........................... 8

        A.   The Sentencing Guidelines................... 8

             1.   The Stipulations....................... 9

             2.   The Offense Involved
                  Sophisticated Means.................... 9

        B.   The Nature and Circumstances
             Of the Offense............................. 13

             1.   The Nature of the Offense is Theft.... 13

             2.   The Defendant Stole His Victims'
                  Money Repeatedly and Systematically... 15

             3.   The Defendant's Motive Was Greed...... 15

             4.   The Defendant's Crimes Had
                  Material Impacts on His Victims....... 17

        C.   History and Characteristics
             Of the Defendant........................... 21

             1.   The Defendant Has Had
                  Every Advantage in Life............... 21

             2.   The Defendant's Lack of
                  Remorse or Empathy.................... 22

             3.   The Court Should Reject the
                  Defendant's Meritless Attempt
                  To Blame His Criminal Conduct on

A Newly-Found Gambling Addiction........ 24

D.   Need for the Sentence Imposed to
     Promote Respect for the Law and
     To Afford Adequate Deterrence................ 38

E.   Need for the Sentence to
     Provide Just Punishment...................... 40

F.   Restitution and Fine......................... 41

G.   Forfeiture................................... 41

CONCLUSION.................................................. 41

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA       :
                               :
          - v. -               :        18 Cr. 43 (CS)
                               :
MICHAEL SCRONIC,               :
                               :
          Defendant.           :
- - - - - - - - - - - - - - - -X

<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The Government respectfully submits this memorandum in connection with the sentencing of defendant Michael Scronic, now scheduled for Monday, September 18, 2018 at 2:00 PM.

I.   <u>Introduction</u>

The defendant defrauded approximately 45 investors in his Scronic Macro Fund (the "Fund") for more than seven years. Many of the investors were the defendant's friends and neighbors.  The defendant claimed in the vast majority of quarters of the Fund's operation that the Fund had a positive investment return when, in fact, it had a negative return in every quarter but one.  The defendant lost most of the money to bad trading decisions and stole an average of more than $500,000 a year from the Fund to pay for his luxurious lifestyle.  By the time of his October 2017 arrest, the defendant had lost and stolen more than $22 million.  The defendant knew full well his conduct was criminal, as he told the agents he had been expecting his arrest for two months.

The defendant, who has enjoyed every advantage in life, appears not to have fully appreciated the gravity of his offense.  Upon his arrest, he rationalized his crime with the false claim that he took no more than twenty percent of his investors' net worth and the false hope that he could make the $22 million back through trading over time.  In between his repeated claims that he is a "really good person," he told the arresting agents he intended to convince his victims to drop the charges against him.  He took more than $30,000 his first set of attorneys had agreed to preserve in their escrow account for restitution and spent much of it on divorce lawyers.  As described in more detail below, he immediately began to lay the groundwork for his claim that his criminal conduct was the result of a newly discovered gambling addiction.

For these reasons and others described below, the Government submits that a sentence within the applicable Guidelines range of 121 to 151 months is the appropriate sentence under Section 3553(a).

II.   The Offense Conduct

A.   The Scronic Macro Fund

The defendant, who holds an MBA from the University of Chicago and a B.A. from Stanford, ran the Fund out of his Pound Ridge, New York home from in or about April 2010 to the day of his arrest on October 5, 2017.  PSR at ¶¶ 10-11.  He told his

investors that the Fund invested in options and that he managed risk by holding the majority of the Fund's assets in cash. PSR at ¶ 12. The defendant told his investors that they could redeem their investments within three business days. See, e.g., Ex. 1.[1] He also told his investors that he had been employed as a professional trader at a large investment bank and thereafter had made a successful living by trading his personal funds. PSR at ¶ 11.

The defendant had sole trading authority over the Fund and acted as the Fund's investment advisor, for which he was to receive a fee of one percent of the amount invested in the Fund and 20 percent of the Fund's annual profits. PSR at ¶¶ 11, 13; Ex. 1. By October 2017, the defendant had raised more than $24.5 million from approximately 45 investors and from G.Y., his college roommate, who lent him $4.5 million as seed money for the fund. PSR at ¶¶ 14-15.

The defendant sent each Fund investor a statement each quarter which showed the Fund's quarterly return and the investor's resulting account balance. PSR at ¶ 16; see, e.g., Ex. 2. The defendant also sent investors periodic emails containing his analysis of the economy and the markets and a

---

[1] The Government has redacted sensitive information from many of the exhibits so that they could be filed on ECF and provided to the victims. The Government will provide unredacted versions of the exhibits to the Court and the defense upon request. The Government has not filed the defendant's medical records on ECF.

description of how the Fund was attempting to take advantage of economic and market conditions.  PSR at ¶ 19; see, e.g., Ex. 3.

    B.   The Defendant's Fraudulent Conduct

       The defendant defrauded the investors by:  1) misrepresenting the Fund's performance; 2) using investor funds for his personal benefit; and 3) omitting material facts about his prior experience as a trader.

       The defendant told investors that the Fund achieved positive returns in the vast majority of quarters, with the highest false return being 13.4% in the fourth quarter of 2014. PSR at ¶¶ 16, 19.  He made similar representations to G.Y. in attempts to renegotiate the payment terms of his loan and to increase the size of the loan.  PSR at ¶ 19.  In reality, the Fund achieved a positive return before commissions only in its first quarter of operation in 2010.  PSR at ¶ 19.  By June 30, 2017, it had net trading losses of approximately $15.7 million before commissions.  PSR at ¶ 19.  Starting in October 2012, the total assets of the Fund reported by the defendant on quarterly account statements he sent to investors always exceeded the Fund's actual total assets.  Complaint (docket no. 2) at ¶ 3(g). The defendant sent his investors quarterly statements as of June 30 showing an aggregate account balance of about $21.7 million. PSR at ¶ 16.  In reality, the Fund had slightly more than $100,000 in assets at that time.  Complaint at ¶ 3(h).

The defendant took money from the Fund for his personal use in amounts exceeding the amounts to which he would have been entitled to receive in fees.  PSR at ¶ 20.  From January 2012 through August 2017, the defendant's personal expenditures, the vast majority of which he paid out of Fund assets, exceeded $2.9 million, or more than $500,000 per year.[2] PSR at ¶ 20.  These expenditures were the result of a luxurious lifestyle and included $12,275 in monthly rent for his 9,590 square foot Pound Ridge home, complete with pool and tennis court, on 10 acres, ex. 4; mortgage payments on a vacation home at the base of Stratton Mountain, PSR at ¶ 20; fees for various clubs, including a $30,000 payment to the Stratton Mountain Club in July 2017, PSR at ¶ 20, ex. 5; and miscellaneous credit card charges averaging more than $15,000 per month, PSR at ¶ 20.  The defendant clearly viewed investor funds as his own.  For example, when two investors sent the defendant a total of $125,000 on June 21, 2017, he retained $20,000 of those funds in his personal checking account and bought a $10,100 bracelet at Cartier with that money later that day.  Complaint, ¶ 4(e), ex. 6.

---

[2] The Government was unable to obtain bank records prior to January 2012 but it is very likely the defendant took money in excess to the fees to which he would have been entitled in 2010 and 2011.  The defendant was otherwise unemployed during that period but he was already incurring substantial personal expenses, including his monthly rent in excess of $11,000 a month on his Pound Ridge home.

The defendant omitted material facts when he told investors that he had been a trader at a large investment bank and that he had made a successful living trading his personal funds.  While the defendant did work at a large investment bank, he never told his investors that he had been fired after sustaining trading losses of approximately $5.8 million.  Ex. 7 at 1.  He also never told investors that he similarly lost his personal funds and then his mother's money through bad trading decisions.  PSR at ¶ 18, ex. 7 at 1.

The defendant's scheme began to collapse in the summer of 2017, when his efforts to raise a sufficient amount of new investor funds to pay redemptions requested by existing Fund investors were unsuccessful.  PSR at ¶ 21.  Between June 2017 and August 2017, at least four investors requested redemptions totaling about $1.5 million.  Complaint at ¶ 3(j).  The defendant gave these investors varying and false explanations as to why he was not redeeming their money.  He said that he was busy and preoccupied with what he claimed to be a relative's serious medical condition; that the Fund would only pay redemptions at quarter end going forward; and that he was unable to pay redemptions because he was on vacation.  In some instances, the defendant ignored redemption requests.  PSR at ¶ 21.

C.   <u>The Defendant's Post-Arrest Statement</u>

The defendant was arrested at his home on October 5, 2017.  At that time, he described to the agents how he came to lose his job at the investment bank.  He said that his pride and ego suffered a 'big blow' due to his trading losses and that he suffered from anxiety and suicidal thoughts.  He decided to trade his personal funds because he needed to prove that he could be a successful trader.  He also decided never to look back at his trading losses.  He then proceeded to lose his and his mother's money.  Ex. 7 at 1.

He began the Fund in 2010 when three of his friends asked him to manage money for them.  He asked G.Y., his college roommate to join the Fund but G.Y. instead lent him $3.5 million as seed money for the Fund at 11% interest.  The defendant lost his friends' and G.Y.'s money.  He lied about the performance of the Fund because it was difficult to tell G.Y. the truth due to their close friendship.  When G.Y.'s loan came due, the defendant convinced G.Y. to extend the due date of the loan and to accept annual interest payments on the loan.  Ex. 7 at 2.

The defendant continued to raise money from other investors.  He did not tell them the truth about the Fund's performance because his ego and pride prevented him from being truthful with investors, family and friends.  He took no more than 15 to 20 percent of each investor's net worth and told them

7

he was limiting the amounts of their investments because the Fund was risky.  Ex. 7 at 2-3.

The defendant admitted that the account balances on the quarterly statements he sent to investors were false.  Ex. 7 at 3.  He calculated the Fund returns he reported to investors based on what, in hindsight, would have happened had he made the correct trades.  Ex. 7 at 2.  He calculated each investor's account balance each quarter by applying these false returns. Ex. 7 at 2.  As of the date of his arrest, the Fund had no more than $250,000 to $300,000 in assets.  Ex. 7 at 2.  He admitted that he lied to or ignored investors when they requested redemptions.  Ex. 7 at 3.

The defendant rationalized lying to his investors by stating that there was "a fine line between investing and gambling," ex. 7 at 2, and stated repeatedly that he was a good person and a hard worker.  Ex. 7 at 2.  As a result, he believed that, over time, he could recover all the losses through trading and repay everyone.  He said he planned on calling his investors when he got home from court and asked if his current situation would change if he convinced his investors not to press charges. Ex. 7 at 2-3.

III.   Application of the Relevant Section 3553(a) Factors

A.   The Sentencing Guidelines

The defendant's final offense level should be 32.  At

category I, that offense level calls for a sentencing range of 121 to 151 months and a fine range of $35,000 to $350,000.

    1.   <u>The Stipulations</u>

       The parties stipulated in the plea agreement that the base offense level was 7, U.S.S.G. § 2B1.1(a)(1); that the offense level should be increased by 20 levels to reflect the loss of $22,326,427, U.S.S.G. § 2B1.1(b)(1)(K); that the offense level should be increased by 2 levels because the defendant's offense involved 10 or more victims, U.S.S.G. § 2B1.1(b)(2)(A); that the offense level should be increased by 4 levels because the offense involved a violation of securities law and, at the time of the offense, the defendant was an investment advisor, U.S.S.G. § 2B1.1(b)(19)(a); and that the offense level should be decreased by 3 levels because the defendant has accepted responsibility in a timely manner, U.S.S.G. § 3E1.1.  The parties expressly disagreed as to whether the offense level should be increased by 2 levels pursuant to U.S.S.G. § 2B1.1(b)(10)(C) because the offense involved sophisticated means and agreed to have the Court resolve this issue.

    2.   The Offense Involved
         <u>Sophisticated Means</u>

       The offense level should be increased by 2 levels because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct

constituting sophisticated means.  U.S.S.G. § 2B1.1(b)(10)(C).

Sophisticated means for purposes of this enhancement means "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  U.S.S.G. § 2B1.1, Application Note 9.  The enhancement "targets conduct that is more complex, demonstrates greater intricacy, or demonstrates greater planning than a routine [criminal offense of the same variety]."  United States v. Lewis, 93 F.3d 1075, 1081 (2d Cir. 1996).

Where a defendant's scheme involves various or repeated steps, the enhancement may apply "even if each step in the scheme was not elaborate."  United States v. Fofanah, 765 F.3D 141, 146 (2d Cir. 2014)("repetitive and coordinated nature" of conduct indicative of sophisticated means); Lewis, 93 F.3d at 1083 ("Even if each step in the [scheme] was simple, when viewed together, the steps comprised a plan more complex than merely filling out a false tax return"); United States v. Jackson, 346 F.3d 22, 25 (2d Cir. 2003), vacated on other grounds sub nom. Lauersen v. United States, 543 U.S. 1097 (2005).  In other words, "[r]epetitive or coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme." United States v. Finch, 407 F.3d 908, 915 (8th Cir. 2005); see Jackson, 346 F.3d at 25 (upholding application of enhancement where "the total scheme was sophisticated in the way all the

10

steps were linked together so that [the defendant] could perceive and exploit different vulnerabilities in different systems in a coordinated way").

The creation and use of false documentation often constitutes "sophisticated means."  See United States v. Valente, 688 Fed.Appx. 76, 80 (2d Cir. 2017)(fabrication of false documents relating to status of funds taken from victims constituted sophisticated means); United States v. Stitsky, 536 Fed.Appx. 98, 112 (2d Cir. 2013)(creation and dissemination of marketing materials containing material misrepresentations factor that led to application of sophisticated means enhancement); United States v. Regensberg, 381 Fed.Appx. 60, 62 (2d Cir. 2010)(creation of fake loan documents and fraudulent earnings statements); United States v. Amico, 416 F.3d 163, 169 (2d Cir. 2005)(creation of false bank documents, appraisals, and blueprints).

Additionally, the duration of a scheme is indicative of sophisticated means.  Stitsky, 536 Fed.Appx. at 112 (applying enhancement where scheme lasted several years); United States v. Regensberg, 381 Fed.Appx. 60, 62 (2d Cir. 2010)(applying sophisticated means enhancement where Ponzi scheme lasted for three years).

Here, the criminal conduct was "more complex, demonstrate[d] greater intricacy, [and] demonstrate[d] greater

11

planning than a routine" fraud.  <u>Lewis</u>, 93 F.3d at 1080.  Among
other things, the defendant:

> created false marketing materials and disseminated
> them to investors, <u>see</u>, <u>e.g</u>., ex. 8;

> prepared and executed investor agreements with most
> investors, <u>see</u>, <u>e.g</u>., ex. 1;

> determined the Fund's supposed return each quarter by
> calculating returns on hypothetical winning trades in
> hindsight;

> applied that return to each of the 45 investors'
> respective account balances each quarter;

> prepared and disseminated each of the 45 investors'
> account statements on a quarterly basis, <u>see</u>, <u>e.g</u>.,
> ex. 2;

> prepared periodic and sophisticated analyses of the
> economy and financial markets the Fund's supposed
> reactions to those economic conditions, <u>see</u>. <u>e.g</u>., ex.
> 3;

> disseminated those analyses to investors in an effort
> to convince them that he was properly managing the
> Fund;

> regularly solicited new investors and new funds from
> existing investors to maintain his lifestyle and have
> sufficient funds to meet redemption requests;

> regularly communicated with existing and potential
> investors about the Fund and economic and market
> conditions generally, often as part of a solicitation
> for additional investments, <u>see</u>, <u>e.g</u>., ex. 9; and

> maintained an online trading platform at the Fund's
> brokerage firm.

The defendant's operation of the scheme was a full time job over
a period of seven years.  The single best indicator of its
sophisticated nature, however, is the fact that he fooled

several well educated, accomplished and experienced investors, including several friends from Stanford University and the business school at the University of Chicago.  Many in this group were in the financial industry.  The defendant's scheme had to be sophisticated to fool these investors and it did.

      B.    <u>The Nature and Circumstances of the Offense</u>

         The nature and circumstances of the defendant's offenses call for a Guidelines sentence.  The defendant worked on a daily basis for seven years to steal a substantial amount of money from a large number of people.  He did so in large part to fund a luxurious lifestyle that many of his victims were unable to afford.  The impact of the defendant's crimes has cascaded beyond his 45 victims because, to the victims, the money the defendant stole was their savings for future college tuition payments for their children or was set aside for a parent's retirement home or medical care.  To add insult to injury, the defendant's victims included many of his close friends.  Some of those friendships went back to college, some even back to the first day of freshman year.  For these victims, dealing with the defendant's betrayal is as difficult as dealing with their monetary losses.

      1.    <u>The Nature of the Offense is Theft</u>

         As an experienced trader, the defendant had to be fully aware of how material his lies were to his victims.  An

investor would have been far less likely to have given the
defendant money in the first place, much less let him keep it,
if they had known the truth about the Fund's performance, the
defendant's history as a trader or the amount of money the
defendant was stealing from the Fund for his personal use.
Further, within relatively a short period of time after he
started the Fund, the defendant had to have realized that he had
dug himself into a multi-million dollar hole that he could not
possibly get out of through trading.  While that realization
would likely have hit home for any adult many years before the
scheme collapsed in October 2017, the defendant has admitted
that he knew for at least the last few months of his scheme that
he was likely to be arrested, meaning that he realized that his
scheme was over.

Despite knowing how material his lies were and that
his scheme was over, the defendant continued to solicit funds
from investors.  He therefore cannot plausibly claim that he
took investor money with good intentions or with a farfetched,
but good faith, hope that he would somehow trade his way out of
a $22 million deficit.  Had that been true, he would have
stopped soliciting new money once he realized the scheme was
over.  The defendant continued to solicit investor money and
spend investor money right up to the very end.  That
solicitation of money at the end of the scheme is particularly

14

revealing of the true nature of his scheme and his true intent. The defendant just intentionally stole money from his investors. The nature of the defendant's offense is theft.

### 2. The Defendant Stole His Victims' Money Repeatedly and Systematically

The manner in which the defendant carried out his thefts is an aggravating factor. He lied repeatedly about the Fund's performance in the account statements he sent out in every quarter but one for seven years. He lied about his history as a trader when he solicited funds from investors for seven years. Each of these lies was a separate crime. The defendant, therefore, repeatedly chose to engage in criminal activity over a period of years. That alone makes him more culpable than a thief who stole money in one act or a few acts.

### 3. The Defendant's Motive Was Greed

The motive for that outright theft is another aggravating factor. The defendant was motivated by greed, as evidenced by the large amount of investor money he skimmed off the top to finance a luxurious lifestyle. The defendant took an average of more than $500,000 a year from the Fund. He used the money to pay his $12,275 a month rent on a 10 acre home, complete with pool and tennis court, in Pound Ridge. He leased a Tesla, among other vehicles. He took expensive vacations, including numerous trips to luxury resorts in Florida. He paid

15

dues and other expenses at the Lawrence Beach Club, an exclusive beach club in Atlantic Beach, NY; the Pound Ridge Tennis Club; and the Grand Slam, an indoor tennis club in Banksville, NY.  He paid hundreds of dollars per ticket to attend concerts and sporting events and often dined at expensive restaurants such as Jean Georges.  He and his wife charged an average of more than $15,000 a month on their American Express cards.

The defendant's spending continued through the last months before he was arrested.  For example, in the six months before his arrest, the defendant's expenses included, in addition to those described above, a $30,000 payment to the Stratton Mountain Club on July 13, 2017, or two and one half months before he was arrested, ex. 5;[3] an $8,700, five-day stay at the Ritz-Carlton in Amelia Island, Florida in April 2017, ex. 10; followed by another trip to Florida in June, ex. 11; an $11,000 Cartier watch in June, ex. 6; $2,600 at an upscale wine shop in backcountry Greenwich in June, ex. 12.

The defendant paid for all of this on money he stole from investors, as he had no other employment or source of income.  He paid no tax on that income.  PSR at ¶ 89.

---

[3] In addition to having access to a private lounge, restaurant and locker rooms, members of the Stratton Mountain Club enjoy access to private underground parking at Stratton's base as well as access to lifts that is separate from the public, thus allowing members to avoid lift lines.

        4.   The Defendant's Crimes Had
             Material Impacts on His Victims

     The Court should also consider the significant impact of the defendant's crimes on his victims.  While the overall $22 million loss is considerable by any measure, five of the victims lost $1 million or more, while 15 victims each lost more than $500,000.  PSR, Attachment A.  The defendant's callous attempt to dismiss the impact of his crimes by claiming that he took no more than 20 percent of an investor's net worth is simply not true.  The Government has been hesitant to pry into the private finances of the victims but we do know of at least four investors who lost more than 20 percent of their net worth.

     Losses of such magnitudes are material by any measure, as demonstrated, by some of the victim impact statements:

     Mr. Scronic knowingly and fraudulently stole a
     significant amount of my life savings, while
     attempting to convince me to invest even more . . . (I
     believe the last instance was mere weeks before his
     arrest).

     Within weeks of my discovery of the fraud
     (perpetrated by someone I considered a friend), my
     girlfriend left me, my performance at work suffered
     markedly, and I fell into a severe depression.  I have
     been dealing with the effects ever since and it has
     affected every aspect of my life, including, among
     other things, my physical and mental health and
     professional performance.

Victim Impact Statement of J.R.  Another victim lost money he had set aside for his son's college education, as well as his mother's savings:

                                17

I asked [the defendant] if he would invest our savings (mine and my former girlfriend who is the mother of my son).  We thought it would be a great way to put some college money away for our son who is currently 8 years old. . . . Neither my ex-girlfriend [nor] I come from a wealthy family and as a result of hard work, it took many years to save the $60,000, so that was A LOT of money for us.

. . . I decided to invest another $30,000 with Scronic in February 2016, and this money came from my mother's savings.

. . . Needless to say, it will take us many years to recover . . .. My mother is retired at 69 years old and living alone in Spain, a country that has been hit with a huge financial crisis in the last ten years. $30,000 is a HUGE amount for anyone, but [e]specially for her.

. . . [The defendant] was using our hard earned money to live an extremely lavish lifestyle, one that we didn't live ourselves as we could not afford such a lifestyle.

Victim Impact Statement from J.G.  Another victim from whom the defendant solicited money three days before his arrest said:

We had just pulled our family of 4 out of debt.  It was our first time we had savings that we could safely invest because our incomes could finally cover our expenses.

Victim Impact Statement of D.F.  Another victim has described the impact the defendant's crimes will continue to have on three generations of his family:

When the company I had an ownership stake [in] was sold in 2016, I gave Scronic a large percentage of my earnings to manage.  These earnings were seen by me at the time as a relief of financial pressures, and a chance to do things I wanted to:

* I have 3 children who all have college ahead
  of them, and this would help with that very
  large burden coming up.  We'll make do, but
  certainly with less comfort due to Scronic.

* My mom lives on a teacher's pension, and I
  had planned to help her buy a retirement
  house at the Jersey shore.  It was
  heartbreaking to have to tell her to stop
  looking for her dream apartment, as I am
  no longer in a position to help.

* . . . I was hoping to leave the business
  world in 3-4 years to work full time at a
  charitable/cause[] based organization
  for which I believe.  This is no longer
  possible in the foreseeable future because
  of Michael Scronic.

Victim Impact Statement of J.W.  Other victims have also lost

the opportunity to assist the next generation with their

education:

> Mike stole $100,000 from us.  It's as simple as
> that. . . .

> We won't pretend to be paupers, but we certainly
> aren't millionaires . . . $100,000 is a lot of money
> for us.  We both have full time jobs and work hard for
> our money.  Neither of us inherited a penny from any
> one or grew up in a country club lifestyle.  We still
> have student loans, and were living in an 800 sq ft
> one bedroom apartment when Mike got himself a 10,000
> sq ft, 10 acre estate with tennis courts, swimming
> pool and screening room. . . .

> We weren't blessed enough to have children.  But
> we have 9 nieces and nephews and we were planning to
> use the savings we invested with Mike to help pay for
> their college tuitions.  Sadly, that's no longer an
> option for us.

Victim Impact Statement of R.L. and L.R.  Another victim

described how the defendant stole the money he intended to use

for college tuitions and also attempted to steal a 79 year old

man's retirement savings:

> At one point in 2016, [the defendant] even asked if my
> father, who had recently retired at the age of 79, was
> interested in investing in the Scronic Macro Fund --
> which at the time was purportedly generating double-
> digit quarterly returns.  Mike didn't know my father
> well but evidently felt no hesitation whatsoever about
> attempting to steal from him.  That Mike was willing
> to embezzle not just the money of his friends, but
> their parents' retirement savings as well, all to his
> own benefit, reflects the depths of his deceit and
> criminality.
>
> . . .
>
> The money that Mike took from us and spent on
> himself amounts to roughly one-fifth of our annual
> income.  It is the equivalent of what we have saved in
> separate accounts for our two children's education.
> The inability to recoup any of the money we invested
> in Mike's fund has also made it more difficult for us
> to provide care for my wife's elderly parents, one of
> whom suffers from dementia.

Victim Impact Statement of R.R.  Another victim made the

important point that while some may not consider her loss to be

large, it was large to her:

> It will take me decades to recoup the financial
> loss I took.  My net loss, before the fictitious gains
> is $117,500.  May not sound like much but it was [a]
> huge safety net for me.

Victim Impact Statement of C.L.

The impact of the defendant's crimes went beyond

monetary losses.  Many of the victims expressed dismay that the

defendant, whom they considered an old friend, cheated them and

their families.  One victim described his "personal guilt" for

recommending Scronic to his mother, who lost over $1 million, as
well as to his family, which lost more than $400,000, as
"immeasurable."  Victim Impact Statement of A.P.  Another victim
described the difficulties he had accepting the fact that a
friend had lied to, and cheated, him:

> I still can't reconcile the Mike I know as my
> good friend with the Mike who stole from me, and it
> has been devastating.  His deception lasted right up
> until the end -- I received a text message from him on
> October 4, 2017, the day before he was arrested,
> talking about market moves and how well the fund was
> going to do as a result.  Lies! . . .
>
> The financial loss is painful enough, and is
> difficult to even think about, but what I cannot
> understand is how Mike could deceive his closest
> friends. . . . It took me a good two months to
> mentally process this terrible event, and for those
> two months I had difficulty sleeping.  I would wake up
> at nearly every night at 3am asking myself "how could
> he have done this?"

Victim Impact Statement of K.B.  Finally, another victim
described the defendant's betrayal in a simple but profound way:

> Scronic was a friend of mine for over 20 years and I
> cannot grasp how a human, let alone a dear friend can
> do this to another being.

Victim Impact Statement of A.P.

   C.   History and Characteristics of the Defendant

      The defendant's history and characteristics make him
more culpable than the average fraud defendant.

      1.   The Defendant Has Had Every Advantage in Life

      At first glance, the defendant's most prominent

characteristic is the fact that he has had every advantage in life.  He has an advanced degree and is a graduate of two of the nation's most elite schools.  He was hired at one of the nation's most respected investment banks.  When he asked to be a proprietary trader, meaning that he would be trading the firm's money, the firm gave him that opportunity.  He was well paid and, upon leaving the firm, had more money than most people will ever have.  That money gave him the opportunity to trade his own funds.  Most importantly, though, the defendant had the trust of several old friends, who gave him their money to invest.

While the defendant makes his life sound like a constant struggle, <u>see</u>, <u>e.g.</u>, ex. 13,[4] most people would have considered themselves very fortunate if they could have traded places with the defendant and enjoy all the advantages he had in life.  Most of the people this Court has had to sentence could honestly say they have never known such advantages or had such opportunities as the defendant had.

 2.   <u>The Defendant's Lack of Remorse or Empathy</u>

The Probation Office and several of the victims have noted the defendant's lack of remorse and lack of empathy for

---

[4] Ex. 13 appears to be a draft of a letter to the Court that the defendant wrote in or about May 2018.  He sent copies of this letter to at least one person, who in turn forwarded it to this Office in June 2018.  This draft letter was heavily edited before it was finally submitted to the Court as Def. Ex. K.  Ex. 13, therefore, is far more revealing of the defendant than Def. Ex. K.

his victims.  The evidence supports those conclusions.  For
example, in the weeks following his October 5 arrest, the
defendant's prior counsel offered to recover $30,000 in payments
the defendant had made that summer to the Stratton Mountain Club
and hold it in his firm's escrow account for restitution.  Ex.
14.  Since the defendant had charged the $30,000 to his American
Express account, the Stratton Mountain Club reversed that
$30,000 charge, as well as other charges, on October 17, thus
giving the defendant a $37,500 credit on his American Express
account.  Ex. 15.  Rather than retain that money for restitution
as agreed, the defendant spent much of the money by giving his
attorneys in his divorce case a $10,000 retainer on November 13.
Ex. 16.  He spent the rest when he gave his new divorce lawyers
a $25,000 retainer 16 days later.  Ex. 17.  It is unlikely that
his first set of divorce attorneys spent down the entire $10,000
retainer he gave them but the defendant has never accounted for
what remained of the $10,000, much less what remained of the
$25,000 retainer after the defendant went *pro se* in his divorce
case.  The victims will never see a dime of the $37,500 that
could have gone toward restitution.  The defendant's needs were
apparently more important to him.

     This incident is not surprising.  As the Probation
Office has observed, the defendant's primary thoughts since his
arrest have been about himself and how he could minimize the

23

damage to his own life.  Immediately upon his arrest and in between his repeated claims that he is "actually a really good person," he proposed calling his victims in an effort to convince them to drop the charges.  Ex. 7.  It is difficult to imagine what truthful statements he could have made to his victims that he thought would be persuasive.

The defendant's narcissistic nature is also apparent in exhibit 13, his May 2018 draft letter to the Court.  While he pays the requisite lip service to his victims in his first paragraph, he barely mentions them again and does not directly acknowledge that he abused their trust, betrayed them or placed them in financial difficulty.  Instead, the letter, to a remarkable degree, is all about Michael Scronic.  He invokes his six year old son repeatedly.  Instead of expressing concern that his son is now in therapy due to his conduct, PSR at ¶ 59, he begs the Court "to enable [the son] and I to continue this journey together without incarceration" or the minimum sentence. Most significantly, he blames his criminal conduct on a newly-found gambling addiction and describes the great anguish he has been suffering as a result of this "disease."  Ex. 13.

### 3. The Court Should Reject the Defendant's Meritless Attempt to Blame His Criminal Conduct on a Newly-found Gambling Addiction

Despite having received extensive psychiatric care arising out of problems with trading in the past; despite having

24

what he now claims to be a history of gambling problems going back to his school days; and despite believing in the last two months of his scheme that his arrest for conduct caused by gambling was imminent, the defendant never said a word about having a gambling problem or sought help for it until his arrest.  Upon arrest, however, he immediately began to emphasize what appears to be an instant self-diagnosis of pathological gambling.  The defendant told the arresting agents before they left his house that there is a "fine line between investing and gambling."  Ex. 7.  Upon leaving the courthouse after his arrest, the defendant went directly to New York Presbyterian Hospital in White Plains, where he told the doctors that he had just been arrested for securities fraud and that "trading is a gamble." Ex. 18.  He later told one of his experts that his chief complaint was "I have a gambling addiction."  Def. Ex. G at 22.  Since his arrest, he has repeatedly described his supposed addiction and recovery efforts to friends and family. See, e.g., exs. 13, 19-21.

        The defendant's doctors appear to have relied solely on the defendant himself for information on which they based their diagnoses.  None of the defendant's health professionals have ever spoken to representatives of this Office, the FBI or the SEC and, as far as we know, to any of the victims in this case.  As far as we know, there is no indication that any of the

defendant's health professionals have reviewed any of the evidence or the FBI agent's and the SEC's respective Complaints. We have no way of knowing what, if anything, the doctors knew about the defendant's outright theft of more than $500,000 a year from the Fund for a luxurious lifestyle that did not include gambling; about the defendant's trading activity; or about what specific lies he told to his investors.  We have no way of knowing if or how any of those things would have changed their diagnoses.  Ex. 18.

The defendant relies heavily on this diagnosis as a mitigating factor in this case and in seeking forgiveness from family and friends.  For example, he told his wife that his "treatment" is a "path of redemption."[5]  Ex. 19.  He similarly told the judge in his divorce case that "I am committed to not let the past define me.  I am working hard to turn my life around.  I want to redeem myself."  Ex. 20 at 3.  He told friends that now that he understands the power of his "internal demons," "[l]ife is great with redemption as life's true gift." Ex. 21.

---

[5] The defendant apparently believes he can move beyond redemption.  His full statement was "I made a bad mistake and through my treatment which is ongoing I have finally realized that I'm an addict and will continue on that path of redemption.  I would love for your family to read the story of the two fables tonight.  It's about two brothers who steal and get branded with s for stealing[.  O]ne just lingers around while the other repents and for the remainder of his life does good work.  When he gets old some boy asks his dad what the S stands for on his head.  The dad says saint."  Ex. 19.

According to the defendant, redemption is possible for him because his crimes arose from a gambling addiction, which "can take hold of a good person and make them commit acts they can't even fathom."  The "good person" cannot be blamed for his unfathomable acts the gambling addiction "made" him commit because he is "not responsible for his disease but is for his recovery."  Ex. 13 at 2.  The defendant believes that redemption is a fair and just outcome for him because his recovery is a "battle" that will lead to his "being the person [he] was and can be once again."  Ex. 13 at 1-2.  In other words, according to the defendant, his punishment for his criminal acts should be relatively lenient because he was not fully responsible for those acts.  Instead, he is the victim of a disease and should be admired for his perseverance in the face of adversity instead of being incarcerated.

The defendant's attempt to blame his criminal conduct on a gambling addiction is inconsistent with the evidence and common sense for several reasons.  First, other than his conclusory statements equating trading and gambling, the defendant has not shown that his trading was gambling.  Contrary to what the defendant told the arresting agents, his doctor after his arrest and the judge in his divorce case, ex. 20 at 2, trading and gambling are not the same thing, as Judge Haight recognized years ago in a case in which a commodities trader

27

claimed he had a gambling addiction:

> Betting at tracks or casinos is gambling, not a
> business.  A track or casino-addicted defendant
> pleading diminished capacity need not prove that self-
> evident truth.  Commodities trading is a business.  To
> be sure, the trader buys or sells based on his
> prediction of what the market will do, and may, using
> a broad definition, be regarded as gambling.  The same
> is true of any investor in the market.  But that is
> too broad a definition to be useful in determining
> whether a particular investor is a "gambler" in
> psychiatric, as opposed to business, terms.  It would
> surprise Wall Street denizens to be told that they are
> all pathological gamblers; and I do not believe that
> they are.
>
> . . .
>
> Harris's proof must at the least distinguish
> persuasively between what all traders do and what he
> did.  He must show that his particular form or pattern
> of trading constituted pathological gambling.

United States v. Harris, 1994 WL 683429 at *5 (S.D.N.Y. 1994).

        The defendant has claimed that his operation of the

Fund was gambling because he "did the same 4-6 trades every

single week for 6 years, all the riskiest the market offered,

short terms options, essentially lottery tickets.  I always

lost."  Ex. 13 at 2.  The defendant's doctors have claimed that

the defendant's supposed "chasing" of his losses in this manner

is evidence supporting their diagnoses.  But merely trading

repeatedly, even repeating the same trades, is not enough:

> A professional trader who loses money on a trade (and
> they all do on occasion) must place another trade in
> an effort 'to get even' or find a different
> occupation, such as the law or psychiatry.  It is more
> difficult to characterize a trader as a pathological

28

> gambling 'chaser' than the individual who plunges day
> after day at the track or casino.

Harris, 1994 WL 683429 at *9.  The defendant has not shown that

his form of trading was anything more than business as usual for

someone in his position.  Further, his claim that the trades

were risky is irrelevant, as there was no risk for him as long

as he continued to lie about his losses.

Second, the defendant has not proven that he suffered

some kind of cognitive impairment to such a degree that a

variance would be justified.  As Judge Haight held in Harris,

what is required from a defendant making such a claim, at least

formerly in the context of a Guidelines departure under §

5K2.13,[6] is:

> reasoning must be distorted, the ability to make
> considered decisions impaired, or other cognitive
> deficiencies demonstrated.  And I think that the more
> sophisticated are the defendant's crimes, the more
> careful and meticulous preparations they require, the
> less likely it is that we are in the presence of a
> defendant with a "significantly reduced mental
> capacity."

---

[6] As of 2003, a gambling addiction can no longer be the basis for a downward
departure.  U.S.S.G. § 5H1.4.  The Government does not dispute that the Court
can consider a variance based on the defendant's alleged gambling addiction
but submits that the Court should also consider the Sentencing Commission's
view of the relevance of so-called gambling addictions to sentencing.  The
view in Harris, which was decided before 2003, that the defendant must show a
cognitive deficiency to warrant a departure is consistent with the
requirement in U.S.S.G. § 5K2.13 that a defendant seeking a departure based
on a significantly reduced mental capacity must show that he suffered from a
"significantly impaired ability to (A) understand the wrongfulness of the
behavior comprising the offense or to exercise the power of reason; or (B)
control behavior that the defendant knows is wrongful," and that this
impairment contributed substantially to the commission of the offense.

Harris, 1994 WL 683429 at *16.  The defendant has presented what may be evidence of bad trading judgment but no evidence of a cognitive deficiency.  In fact, the evidence shows the opposite. As described above, the defendant was able to operate this complex scheme over an extended period of time and, in the process, fool several well educated, accomplished and experienced investors.  He himself was similarly well educated and had worked and, for a time, succeeded, at one of the nation's leading investment banks.

Third, the defendant has failed to show that his supposed gambling habit caused his criminal acts.  He has, in fact, shown otherwise.  By his own admission, e.g., ex. 13, the defendant did not lie to his investors or steal more than $2.9 million to further a gambling habit.  Instead, he lied about the Fund's returns to hide his losses from his investors, G.Y. and his wife, as well as to continue his luxurious lifestyle. Further, as the defendant describes it, his supposed addiction only led him to engage in risky trading and to the unrealistic belief that he could recover his losses.  The defendant's claims, even if true, explain nothing more than his poor trading decisions and the duration of his criminal activity.  They do not explain his repeated lies over a period of years or his thefts to fund his luxurious lifestyle.

Judge Kaplan rejected the idea that a downward departure is appropriate where, for example, "compulsive gambling creates the motive for the offense behavior" instead of being the direct cause of the behavior. United States v. Grillo, 2003 WL 22999219 at *2 (S.D.N.Y. 2003). In Grillo, the defendant claimed that his compulsion to gamble significantly impaired his ability to control his offense behavior. Id. at *1. Judge Kaplan rejected this claim, noting that, like the defendant here,

> [a]s long as he had funds to support his gambling, he did not steal. When he ran out of money to support his gambling habit, he began to steal. In short, the compulsive gambling created the financial need that was the motive to steal.

Id. Judge Kaplan cautioned against downward departures in cases "where reduced mental capacity merely results in conduct that creates the motive for the criminal behavior as distinguished from conduct constituting the criminal behavior," noting that "[a]ll crimes are committed out of motives," and the result of such departures could lead to essentially excusing a wide variety of criminal behavior for people who turn to crime after spending all of their assets due to compulsive behavior. Id. at *2-3. Similarly, Judge Marrero has rejected the idea that a departure for diminished capacity based on compulsive gambling was appropriate where the "alleged compulsion would only relate

31

to the <u>motive</u> for [the crime], not the [crime] itself." <u>United States v. Kim</u>, 313 F.Supp.2d 295, 298 (S.D.N.Y. 2004).

<u>Harris</u>, <u>Grillo</u>, and <u>Kim</u> stand for the proposition that a departure is unwarranted where a claimed gambling addiction is not the direct cause of the offense.  In those cases, it was at best the motive for the crime.  Here, at best, it could only explain the origin of the circumstances that led the defendant to lie to his investors -- his bad trading decisions -- and reason why he kept his scheme going for so long.  There is no contention (nor could there be) that the defendant's supposed gambling compulsion <u>caused</u> him to steal millions of dollars from his clients.  The defendant, therefore, would not be entitled to a departure even if the Guidelines permitted it.  While there are differences between departures and variances, none of those differences would justify a variance in this case.

Fourth, the defendant's arguments regarding his gambling addiction are inconsistent with the fact that he stole more than $2.9 million, or an average of more than $500,000 a year, tax free, from the Fund and used it to pay for what was a luxurious lifestyle by any definition.  Had the defendant been a true compulsive gambler, he would have seen much of that extra $500,000 a year as a source of funds for additional gambling and would not have spent it on unnecessarily lavish items as the defendant did.  As noted above, the defendant's diversion of

32

such large amounts to fund such a lifestyle shows his true
mental state throughout the seven years he was committing his
crimes.  He was driven by greed.[7]

        Fifth, the defendant's claim of compulsive gambling is
inconsistent with his own statements regarding his offense.
Upon his arrest, the defendant told the FBI that he had tried to
tell his victims the truth about their money a few times but was
unable to do so due to ego and pride.  He stated further that it
was particularly difficult to tell G.Y. the truth due to their
close friendship.  Ex. 7 at 2-3.  He similarly told a friend in
February 2018 that he and G.Y., his college roommate, "were
super close friends all while being fiercely competitive with
each other" and that he "had too much pride to tell [G.Y.] that
I wasn't successful in my own profession and further that I lost
his money."[8]  He stated further that "I just couldn't bring

---

[7] This $2.9 million theft -- and, as noted above, that figure is likely higher
-- is a serious offense by itself.  If the defendant had just stolen that
$2.9 million in the same manner as he did here and had not also lied about
the Fund's performance, his resulting Guidelines offense level would call for
a sentence of 78 to 97 months.  If, as is likely, the defendant took more
than $3.5 million over the full seven and one half years of the Fund's
operation, his resulting Guidelines offense level would call for a sentence
of 97 to 121 months.  The defendant cannot plausibly claim that a gambling
addiction caused him to steal $2.9 million, or more, to fund a luxurious
lifestyle.

[8] The defendant had a similar reaction in 2005 when he suffered large losses
while trading on the proprietary desk at the investment bank.  He told his
doctor then that he was despondent about his "professional capabilities as a
trader" and was "worrying constantly that he would be a failure and would
never be good at his job again."  Ex. 22.  In February 2018, he described the
2005 incident by saying that "I had never ever imagined to be in such a
position and immediately felt an immense sense of failure.  . . . I never
ever had given up in my life in anything, and my decision to take my

33

myself to tell [the defendant's wife] one more time that I had failed again. I couldn't do it to her." Ex. 21. What is consistent with the evidence is that being a successful trader has always been important to the defendant; that he took great pride in his knowledge and experience; and that he could not bring himself to admit to Fund investors, G.Y. and his wife that he had lost a substantial amount of money through trading this third time around due to a combination of pride and greed.

Sixth, the circumstances under which the defendant's claim that his conduct is due to a gambling addiction arose are suspicious. As the defendant has admitted (and as the evidence shows), the defendant sought and underwent psychiatric treatment in 2005, when he lost money at the investment bank. The defendant lost this money through legal trading and therefore had no motive to manufacture a defense. At no time during that treatment did the defendant say that he was addicted to gambling and, as he has confirmed under oath, he was not diagnosed with a gambling problem. Ex. 20 at 2.

The defendant has admitted that, at least for the last two months of his operation of the Fund, he knew he was committing a crime and that the scheme was likely ending. Ex. 7

---

positions down, which was exactly that, broke me. I literally stopped functioning . . .." He eventually became "determined to show myself and my ex [investment bank] colleagues that I could succeed again, especially if I vowed to never give up." Ex. 21.

34

at 2.  Despite that knowledge, the defendant never sought treatment for a gambling problem until after his arrest, even though he knew enough upon his arrest to tell the agents that there is a "fine line between investing and gambling," ex. 7 at 2, and to check himself into the hospital upon leaving the courthouse.  It was not until after his arrest and after similarly equating trading and gambling with his doctor that he was diagnosed, after all these years, with a gambling disorder that, according to the defendant's own words as described above, explains away at least moral responsibility for his crimes as long as he fights the "battle" to gain redemption.

Seventh, and finally, the evidence the defendant offers in support of his request for a variance is not persuasive.  As noted above, the doctors' diagnoses are based on the defendant's own self-serving statements.  See Harris, 1994 WL 683429 at *9 (noting reduced value of diagnosis based on self-serving statements of defendant and his family and friends).  As far as we can tell, the doctors were unaware of: 1) the magnitude of the defendant's repeated thefts from the Fund to pay personal expenses that had nothing to do with gambling; 2) the defendant's alternate explanation for his crime that ego and pride prevented him from admitting to family, G.Y. and investors that he had failed again as a trader; and 3) the suspicious circumstances under which the defendant's claim of a

gambling addiction arose, among other things.  Since the doctors
have not been subject to cross-examination, we have no way of
knowing whether any of these things would have made a difference
in their diagnoses.  See Harris, 1994 WL 683429 at *9 (hearsay,
here diagnoses of doctors, of "limited value in resolving
disputed fact issues").

Further, both doctors seem predisposed to diagnose
gambling problems.  Aside from the presumed fact that they were
both paid for their work, Dr. Block, in particular, appears to
be more of an advocate than a detached, critical expert.  He is
a founder and current president of an advocacy group "dedicated
to raising public awareness about public gambling across New
York State."  Def. Ex. A at 1.  His diagnosis appears to be more
of a plea for a desired sentencing result than a medical report
to a sentencing judge.  He claims that prison is "an obvious
threat" to "those in addiction recovery," like the defendant,
because "gambling is rampant in most prison settings."  He
argues further that "recovery efforts are greatly enhanced by
the supportive atmosphere provided by the family setting" – in
other words, a setting outside a correctional facility – and
that "[a]ny change in the family dynamics" – in other words, a
sentence of incarceration – "would further compromise his
recovery efforts."  Def. Ex. A at 7.  As was the case with the
defense expert in Harris, "declarations of this nature are less

than fully helpful to a Court seeking the guidance of objective clinical findings." Harris, 1994 WL 683429 at *8.

Dr. Block's analysis is also conclusory.  In his application of the DSM's nine diagnosic criteria, he relies on those facts that support a diagnosis of pathological gambling, while ignoring outright the obvious facts that suggest a different result.  For example, he argues that the defendant was preoccupied with gambling because he spent "many hours thinking about gambling" but fails to note that the defendant's full time employment was the very activity that "preoccupied" him. Similarly, he ignored the fact that the defendant was a full time trader in his claim that the defendant "chased" his losses. He ignores the fact that the defendant was operating a Ponzi scheme when he argues that the defendant "borrowed" money from friends and that he needed more and more money to gamble over time.  He ignores the fact that the defendant was committing serious crimes when he concluded that the defendant concealed his activities and that he lost his career and reputation due to gambling.  He cites no evidence to support his conclusions that the defendant attempted to cut back on his gambling or that he gambled to escape problems arising from his earlier gambling.

While Dr. Potenza recognizes that the DSM's nine factors are the "gold standard" for diagnosing pathological gambling, Def. Ex. G at 6, he does not even discuss the

37

application of those factors to the defendant.  Instead, he reports in his 34 pages that the defendant's test scores indicate he is impulsive and that he suffers from alexithymia[9] and that his medical records indicate that he has narcisistic personality disorder.  Since individuals with gambling disorders often exhibit those traits, Dr. Potenza reasons, the defendant must have a gambling disorder too.  Dr. Potenza's analysis is hardly persuasive, to say the least.

D.   Need for the Sentence Imposed to Promote Respect
     For the Law and to Afford Adequate Deterrence

     The financial markets are dependent on reliable and transparent information about investments.  More than $70 trillion in assets were professionally managed for fees worldwide in 2015.  See www.agefi.fr/sites/agefi.fr/files /fichiers/2016/07/bcg-doubling-down-on-data-july-2016_tcm80- 2113701.pdf at 5.  The managers of that money have near exclusive control over information regarding those assets and investors place a great deal of trust in the managers to provide accurate information about their investments.  The financial industry, which ultimately distributes capital to where it can be used most efficiently, cannot work without that trust and the world's economy cannot prosper without efficient access to

---

[9] Wikipedia defines alexithymia as a "personality construct characterized by the subclinical inability to identify and describe emotions in the self. The core characteristics of alexithymia are marked dysfunction in emotional awareness, social attachment, and interpersonal relating."

capital.  That capital will not be forthcoming from investors if they believe they cannot trust the information they are getting about their investments.[10]  The need for general deterrence from frauds in the financial industry in this case is readily apparent.

That need for general deterrence is particularly acute with Ponzi schemes, which show no sign of abating.  Since 2012, an average of 65 Ponzi schemes a year are discovered, with a median scheme size of approximately $6 million.  "Investors Beware:  The Ponzi Scheme is Thriving," Financial Times, March 30, 2017.  As this case has demonstrated, even sophisticated, well-educated investors can be victims of such schemes which, by definition, will always eventually lead to investor losses.  Operators of Ponzi schemes generally are risk-takers and a Guidelines sentence here and in other similar cases is necessary to help deter such schemes in the future.

While the defendant is not likely to attract investor money in the future, a peculiar aspect of his character

---

[10] The events of 2002 demonstrated that investors' loss of confidence in the integrity of information about investments makes raising capital more difficult.  A. Berenson, "Week in Review," *New York Times*, February 10, 2002 ("If investors cannot believe the figures put out by public companies, they will be less willing to risk their money on stocks"); E. Iwata, "Enron's Legacy:  Scandal Marked Turning Point," *USA Today*, January 29, 2006 (accounting scandals at Enron, Worldcom and other issuers "shook investors' confidence and made it harder for companies to raise capital"); J. Castellano, "Restoring Public Confidence," *Journal of Accountancy*, April 2002 ("The public's confidence has clearly been shaken").

indicates a need to deter him specifically from future crimes. The defendant has spoken and written repeatedly about his strategy of never looking back at the past.  For example, he told the arresting agents that in 2005, he "decided to never allow himself to look back and see his trading losses."  Ex. 7 at 1.  He told friends in February 2018 that, during his operation of the Fund, he "never once allowed [him]self to look at the capital losses building in my trading platform.  That would be a negative."  Ex. 21.  He similarly told the judge in his divorce case that "I am committed to not let the past define me."  Ex. 20.  One, like the defendant, who ignores his past is unable to learn from his mistakes.  That makes the defendant a greater risk of recidivism, especially when combined with his narcissistic personality and lack of remorse.  The sentence the Court imposes here should take that greater risk of recidivism into account.

    E.   <u>Need for the Sentence to Provide Just Punishment</u>

       For the reasons already set forth above, justice requires a Guidelines sentence in this case.  While the defendant's offense alone is worthy of substantial punishment, the defendant's personal characteristics -- his narcissistic personality, his lack of remorse and his admitted refusal to learn from the past -- are aggravating factors that serve as additional justification for a Guidelines sentence.

F.   <u>Restitution and Fine</u>

The defendant agreed in his plea agreement to the entry of an order that he make restitution to the persons identified in Attachment A to the pre-sentence report in the amounts specified therein.  He also agreed in the plea agreement that the obligation to make such restitution could be made a condition of supervised release or probation.

G.   <u>Forfeiture</u>

The Court has already entered a preliminary order of forfeiture of the defendant's Stratton condominium and of the vacant land the defendant owned in Pawling, New York.  The Government is in the process of forfeiting these properties.

<u>CONCLUSION</u>

For the reasons stated above, the Government respectfully requests that the Court sentence the defendant to a sentence within the applicable Guidelines range as calculated above.

                                    Respectfully submitted,

                                    GEOFFREY S. BERMAN
                                    United States Attorney


                              By:   /s/_____
                                    JAMES MCMAHON
                                    DANIEL LOSS
                                    Assistant United States Attorneys

Dated:       September 11, 2018
             White Plains, New York

cc:  Defense counsel
        (by ECF)