```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA        :
                                :
        - v. -                  :     18 Cr. 43 (CS)
                                :
MICHAEL SCRONIC,                :
                                :
            Defendant.          :
- - - - - - - - - - - - - - - -X
```

### GOVERNMENT'S RESPONSE IN OPPOSITION TO THE
### DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

AUDREY STRAUSS
Acting United States Attorney for
  the Southern District of New York
Attorney for the United States
  of America


James McMahon
Daniel Loss
Assistant United States Attorneys

- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA          :
                                  :
          - v. -                  :          18 Cr. 43 (CS)
                                  :
MICHAEL SCRONIC,                  :
                                  :
               Defendant.         :
- - - - - - - - - - - - - - - -X

### GOVERNMENT'S RESPONSE IN OPPOSITION TO THE
### DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

The Government respectfully submits this memorandum in opposition to the defendant's motion for compassionate release. For the reasons stated below, the defendant has not met his burden of showing both an extraordinary and compelling reason that would warrant a 75% reduction in his sentence and that the sentencing factors in Section 3553(a) would warrant such a reduction.

I.   The Offense Conduct

The defendant defrauded approximately 45 investors in his Scronic Macro Fund (the "Fund") for more than seven years. He ran the Fund out of his Pound Ridge, New York home from in or about April 2010 to the day of his arrest on October 5, 2017. He told his investors that the Fund invested in options and that he managed risk by holding the majority of the Fund's assets in cash. The defendant told his investors that they could redeem their investments within three business days. He also told his

investors that he had been employed as a professional trader at a large investment bank and thereafter had made a successful living by trading his personal funds.

The defendant had sole trading authority over the Fund and acted as the Fund's investment advisor, for which he was to receive a fee of one percent of the amount invested in the Fund and 20 percent of the Fund's annual profits.  By October 2017, the defendant had raised more than $24.5 million from approximately 45 investors and from G.Y., his college roommate, who lent him $4.5 million as seed money for the fund.

The defendant claimed in the vast majority of quarters of the Fund's operation that the Fund had a positive investment return when, in fact, it had a negative return in every quarter but one.  The defendant lost most of the Fund's money to bad trading decisions.  He also stole more than $2.9 million[1], or more than $500,000 a year, from the Fund to pay for his luxurious lifestyle that included a 9,590 square foot home, complete with pool and tennis court, on 10 acres in Pound Ridge; a vacation home at the base of Stratton Mountain; and credit card charges averaging more than $15,000 per month.  By the time of his October 2017 arrest, the defendant had lost and stolen

---

[1] The defendant likely stole more than $2.9 million.  The Government was unable to obtain bank records prior to January 2012 and therefore was unable to investigate the defendant's potential thefts from the Fund between the Fund's April 2010 inception and January 2012.

more than $22 million.  Many of his victims were the defendant's friends and neighbors.

The defendant omitted material facts when he told investors that he had been a trader at a large investment bank and that he had made a successful living trading his personal funds.  While the defendant did work at a large investment bank, he never told his investors that he had been fired after sustaining trading losses of approximately $5.8 million.  He also never told investors that he similarly lost his personal funds and then his mother's money through bad trading decisions.

II.  The Defendant's Motion

The defendant has moved for a reduction in his sentence to time served and cites several reasons in support of his motion.  First, he claims that he is at increased risk of severe illness from coronavirus under the current Center for Disease Control guidelines because he is obese and has cancer and heart conditions.  In connection with that argument, he claims that the BOP is mismanaging the pandemic at his facility. Second, he claims that the conditions of his sentence are so much more onerous than those originally intended by the Court that his immediate release is warranted.  Third, he claims that he is rehabilitated, has been a model prisoner and presents a low risk of recidivism.

III. Applicable Law

Under 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, the Court "may not modify a term of imprisonment once it has been imposed except" as provided by statute.  As relevant here:

> [T]he court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights . . . or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

*Id.* The applicable policy statement, which appears at § 1B1.13 of the U.S. Sentencing Guidelines, provides that a reduction in sentence is permitted if: "[e]xtraordinary and compelling reasons warrant the reduction," U.S.S.G. § 1B1.13(1)(A); "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3).

Thus, there are four prerequisites for granting a compassionate release motion under the First Step Act.  First, a defendant must have exhausted his administrative rights.  *See* 18

4

U.S.C. § 3582(c)(1)(A).  Second, the court must find that that "extraordinary and compelling reasons warrant" a reduction of sentence.  18 U.S.C. § 3582(c)(1)(A)(i).  Third, the court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a).  And, fourth, the court must find that release is consistent with the Sentencing Commission's policy statements.  18 U.S.C. § 3582(c)(1)(A).  As the proponent of the motion, the defendant bears the burden of proving each of these prerequisites.  *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *United States v. Ebbers*, 432 F. Supp. 3d 421, 426 (S.D.N.Y. 2020)("The defendant has the burden to show he is entitled to a sentence reduction.")(citing Butler); *United States v. Givens*, No. 14 CR 546-09 (CM), 2020 WL 4699042, at *2 (S.D.N.Y. Aug. 13, 2020)(same).

IV.  <u>Argument</u>

    A.   The Defendant Has Not Shown an
           Extraordinary and Compelling Reason
           <u>For a Reduction of His Sentence</u>

      The defendant has not met his burden of showing an extraordinary and compelling reason for a reduction of his sentence.[2]  His claims with respect to his health are largely

---

[2] The defendant exhausted his administrative remedies by requesting compassionate relief from the BOP in April 2020.

belied by the BOP's medical records, as well as the records from his own physician that he attached as an exhibit to his motion. He ignores the significant efforts the BOP has made to respond to the threat posed by the pandemic.  While the pandemic has made daily prison life more difficult, such a claim, standing alone, cannot warrant relief.  Similarly, Congress has mandated that rehabilitation, standing alone, cannot warrant relief.  The defendant has not shown any condition or combination of conditions that are "extraordinary and compelling."

### 1.   The Defendant's Health

The BOP's medical records and the defendant's physician's records demonstrate that the defendant's health does not constitute an extraordinary and compelling reason to reduce his sentence.  First, the defendant does not have a body mass index ("BMI") of 31 -- just over the CDC's BMI risk threshold of 30 -- as he claims.  The BOP's medical records consistently show a BMI of under 30 during the time he has been incarcerated. *See, e.g.*, BOP 000021 (BMI of 29.4 at surrender in November 2018); BOP 000041 (BMI of 28.3 as of February 2019); BOP 000067 (BMI of 28.3 as of November 2019, noting that "[h]e has lost 35 lbs since being incarcerated"); BOP 000140 (BMI of 28.3 as of April 2020).[3]  The defendant's physician's records show a BMI of

---

[3] The Government will email the defendant's BOP medical records to the Court and to the defendant instead of filing them on ECF.

28.8 as of February 2018, or about nine months before he was
incarcerated.  According to the CDC, "[h]aving obesity, defined
as a body mass index (BMI) between 30 kg/m2 and <40 kg/m2 or
severe obesity (BMI of 40 kg/m2 or above), increases your risk
of severe illness from COVID-19."  Center for Disease Control,
*Coronavirus Disease 2019 (COVID-19), People with Certain Medical
Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/
need-extra-precautions/people-with-medical-conditions.html.  The
defendant is not obese under the CDC standard and he cannot show
that he is at increased risk of severe illness from COVID-19.
At best, his BMI of 28.3 shows that he is overweight, which
*might* increase his risk of severe illness from COVID-19.  *Id*.
That does not rise to the level of extraordinary and compelling.

While the CDC recognizes that having cancer increases
the risk of severe illness from COVID-19, the medical records
show that his cancer consisted of a basal cell carcinoma that
was entirely removed and resolved.  The defendant reported upon
his November 2018 surrender a history of "Basal Cell Cancer on
Anterior Chest wall which was excised 12/2017."  BOP 000007.
The records show that the carcinoma "[w]as removed and no issues
since."  BOP 000009.  As of November 2019, the defendant had
"seen the Dermatologist in 9/2019 with no evidence of
reoccurrence."  BOP 000067.

Basal cell carcinoma is the least risky type of skin

cancer.  It grows slowly and is easily removed by surgery or topical creams.  WebMD, *Basal Cell Carcinoma*, www.webmd.com/melanoma-skin-cancer/melanoma-guide/basal-cell-carcinoma#1.  The defendant offers no authority, nor is the Government aware of any authority, for the proposition that resolved basal cell carcinoma increases the risk of severe illness from coronavirus such that it would justify his compassionate release.  There is no evidence that the defendant suffers from any other cancer.

The defendant has none of the heart conditions identified by the CDC as increasing one's risk of severe illness from coronavirus.  Those conditions are heart failure, coronary artery disease, cardiomyopathies and pulmonary hypertension.[4] *Coronavirus Disease 2019 (COVID-19), People with Certain Medical Conditions*, *supra*.  The BOP's medical records show that the defendant denied having cardiovascular problems when he was initially incarcerated, BOP 000009, and that physical examinations revealed no cardiac issues, other than mild hypertension, with systolic readings in the mid-130's.[5]  *See,*

---

[4] Pulmonary hypertension, as opposed to hypertension, is high blood pressure in the pulmonary artery, which transports blood from the heart to the lungs. Mayo Clinic, *Pulmonary Hypertension*, www.mayoclinic.org/diseases-conditions/pulmonary-hypertension.

[5] Systolic blood pressure is the pressure exerted by blood against artery walls when the heart contracts.  Systolic readings in the 130s are considered hypertension stage 1.  Treatment is likely to be lifestyle changes and possibly blood pressure medication.  American Heart Association,

*e.g.*, BOP 000006 (noting "IM has had some episodes of high blood pressure but has never been of [sic] medication"); BOP 000067; BOP 000092.  The defendant's physician's medical records say the defendant has a heart murmur, palpitations and hypertension. The BOP records, however, show the defendant has no history of heart murmur.  BOP 000023, 000027.  The defendant's physician's records state that "Pt does complain of PALPITATIONS, RARE, AND ONLY WITH VIGOROUS EXERTION; SOB[6], AND ONLY WITH VIGOROUS EXERTION."  Palpitations and shortness of breath are hardly uncommon following vigorous exertion.  Regardless, none of those conditions identified by the defendant's physician are specifically identified by the CDC as increasing one's risk of severe illness from coronavirus.

The defendant's motion also fails to acknowledge the series of aggressive actions the BOP has taken to prevent the spread of coronavirus.  Beginning in January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel.  *See* Federal Bureau of Prisons COVID-19 Action Plan, *available at* https://www.bop.gov/ resources/news/20200313_covid-19.jsp.  As part of its Phase One response to COVID-19, BOP began to study "where the infection

---

*Understanding Blood Pressure Readings*, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings.

[6] SOB is a medical abbreviation for shortness of breath.

was occurring and best practices to mitigate transmission." *Id.*
In addition, the BOP set up an agency task force to study and
coordinate its response to COVID-19, including using "subject-
matter experts both internal and external to the agency . . .."
*Id.*

On March 13, 2020, the BOP implemented its Phase Two
response "in order to mitigate the spread of COVID-19,
acknowledging the United States will have more confirmed cases
in the coming weeks and also noting that the population density
of prisons creates a risk of infection and transmission for
inmates and staff." *Id.* These national measures are intended
to "ensure the continued effective operations of the federal
prison system and to ensure that staff remain healthy and
available for duty." *Id.* For example, the BOP (a) suspended
social visits for 30 days (but increased inmates access to
telephone calls); (b) suspended legal visits for 30 days; (c)
suspended inmate movement for 30 days (with case-by-case
exceptions, including for medical treatment); (d) suspended
official staff travel for 30 days; (e) suspended staff training
for 30 days; (f) restricted contractor access to BOP facilities
to only those performing essential services, such as medical
treatment; (g) suspended volunteer visits for 30 days; (h)
suspended tours for 30 days; and (i) generally "implement[ed]
nationwide modified operations to maximize social distancing and

10

limit group gatherings in [its] facilities." *Id.*  In addition, the BOP has implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by the BOP's infectious disease management program. *Id.*  As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.*

On March 18, 2020, the BOP implemented Phase Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical supplies; (c) making sure that ample supplies were on hand and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event. *See BOP Update on COVID-19*, *available at* www.bop.gov/resources/ news/pdfs/20200324_bop_press_release_covid19_update.pdf·.

On March 26, 2020, the BOP implemented Phase Four, which entailed: (a) updating its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed

11

using a screening tool and temperature check (including all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival); (b) placing asymptomatic inmates in quarantine for a minimum of 14 days or until cleared by medical staff; and (c) placing symptomatic inmates in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. *See* BOP COVID-19 Action Plan: Phase Four, *available at* www.bop.gov/resources /news/20200331_covid19_action_plan_5.jsp.

On April 1, 2020, the BOP implemented Phase Five, which entailed: (a) securing inmates in every institution to their assigned cells/quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the United States Marshals Service to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording limited group gatherings to the extent practical to facilitate commissary, laundry, showers, telephone, and computer system access. *Id.*

On April 13, 2020, the BOP implemented Phase Six,

12

which extended all of the nationwide measures implemented in
Phase Five, including continuing to perform rigorous medical
screening, limiting inmate gathering, daily rounds, limiting
external movement, and fit testing, until May 18, 2020.

On May 18, 2020, the BOP extended all measures from
Phase Six, to include measures to contain movement and decrease
the spread of the virus, through June 30, 2020. *See* COVID-19
Action Plan: Phase Seven, BOP, https://www.bop.gov/resources
/news/20200520_covid-19_phase_seven.jsp. On June 30, 2020, the
BOP extended all measures from Phase Seven through July 31,
2020, and provided further guidelines surrounding inmate court
appearances, inmate intakes, and inmate movement between
institutions. *See* https://www.bop.gov/foia/docs/
COVIDPhase8June30.pdf.  On August 5, 2020 the BOP
announced Phase Nine, extending all previous measures through
August 31, 2020, and suspending in-person staff training and
non-essential travel, and providing guidelines for legal visits,
staff recreation, and several of the topics covered in Phase
Eight. (*See* https://prisonology.com/wpcontent/uploads/
2020/08/COVID-19-Phase-9-COVID-Action-Plan.pdf.)  The BOP has
also "increased Home Confinement by over 40% since March and is
continuing to aggressively screen all potential inmates for Home
Confinement." Update on COVID-19 and Home Confinement, BOP,
https://www.bop.gov/resources/news/20200405_covid19_home_confine

ment.jsp. In addition, the BOP "has begun immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton and similarly-situated facilities [with COVID-19 outbreaks] to determine which inmates are suitable for home confinement." *Id*.

### 2. More Onerous Conditions

The defendant argues that the fact that his facility has been in lockdown since April, while not extraordinary and compelling on its own, could, in combination with other reasons, weigh in favor of compassionate release.  The defendant is correct in noting that harsher and more punitive conditions of incarceration resulting from the pandemic do not, standing alone, qualify as an extraordinary and compelling reason warranting a sentence reduction.  *United States v. Rodriguez*, 2020 WL 5810161 at *3 (S.D.N.Y. September 30, 2020).  As Judge Rakoff has noted, "lockdowns are a routine fact of life for incarcerated defendants and are hardly extraordinary." *United States v. Pinto-Thomaz*, 454 F.Supp.3d 327, 331 (S.D.N.Y. 2020). While more punitive conditions can be considered in conjunction with other factors, the defendant has not offered any extraordinary and compelling combination of factors that would justify such a substantial reduction in his sentence.

3.   Rehabilitation

The defendant has failed to show that his rehabilitation is extraordinary and unique.  He has done good things, including teaching classes to other inmates and running in a marathon to support a book drive.  As he notes, however, Congress has directed that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" with respect to compassionate release motions.  28 U.S.C. § 994(t).  While extraordinary rehabilitation can be considered in conjunction with other factors, the defendant has not offered any extraordinary and compelling combination of factors that would justify such a substantial reduction in his sentence.

4.   Risk of Recidivism

The defendant also claims he presents a low risk of recidivism.  Even if true, the Court already considered that risk when it imposed sentence.  The defendant has not offered any argument that his risk of recidivism has changed so much in two years such that it would present an extraordinary and compelling reason favoring his release.

B.   The Section 3553(a) Factors Do
     Not Justify a Sentence Reduction

The defendant has also failed to show that the Section 3553(a) factors would warrant a sentence reduction.

1.   The Nature and Circumstances of the Offense

The defendant committed a serious crime involving numerous repeated criminal acts over an extended period of time. He worked on a daily basis for seven years to steal more than $22 million from approximately 45 people. While that loss is considerable by any measure, five of the victims lost $1 million or more, while 15 victims each lost more than $500,000. To add insult to injury, the defendant's victims included many of his close friends. Some of those friendships went back to college, some even back to the first day of freshman year. For these victims, dealing with the defendant's betrayal was as difficult as dealing with their monetary losses. The impact of the defendant's crimes cascaded beyond his 45 victims because, to the victims, the money the defendant stole was their savings for future college tuition payments for their children or was set aside for a parent's retirement home or medical care.

The defendant was motivated by greed, as evidenced by the large amount of investor money he skimmed off the top to finance a luxurious lifestyle. The defendant took an average of more than $500,000 a year from the Fund. He used the money to pay his $12,275 a month rent on his 10 acre Pound Ridge home. He leased a Tesla, among other vehicles. He took expensive vacations, including numerous trips to luxury resorts in Florida. He paid dues and other expenses at the Lawrence Beach

Club, an exclusive beach club in Atlantic Beach, NY; the Pound
Ridge Tennis Club; and the Grand Slam, an indoor tennis club in
Banksville, NY.  He paid hundreds of dollars per ticket to
attend concerts and sporting events and often dined at expensive
restaurants such as Jean Georges.  He and his wife charged an
average of more than $15,000 a month on their American Express
cards.

> 2.   <u>History and Characteristics of the Defendant</u>

The defendant's history and characteristics make him
more culpable than the average fraud defendant.

> a.   The Defendant Had
>      <u>Every Advantage in Life</u>

At first glance, the defendant's most prominent
characteristic is the fact that he had every advantage in life.
He has an advanced degree and is a graduate of two of the
nation's most elite schools.  He was hired at one of the
nation's most respected investment banks.  When he asked to be a
proprietary trader, meaning that he would be trading the firm's
money, the firm gave him that opportunity.  He was well paid
and, upon leaving the firm, had more money than most people will
ever have.  That money gave him the opportunity to trade his own
funds.  Most importantly, though, the defendant had the trust of
several old friends, who gave him their money to invest.

Most of the people this Court has had to sentence

could honestly say they have never known such advantages or had such opportunities as the defendant had.

      b.   <u>The Defendant's Lack of Remorse or Empathy</u>

At the time of sentencing, the Probation Office and several of the victims noted the defendant's lack of remorse and lack of empathy for his victims. The evidence supported those conclusions. For example, in the weeks following his October 5 arrest, the defendant's prior counsel offered to recover $30,000 in payments the defendant had made that summer to the Stratton Mountain Club and hold it in his firm's escrow account for restitution. Since the defendant had charged the $30,000 to his American Express account, the Stratton Mountain Club reversed that $30,000 charge, as well as other charges, on October 17, thus giving the defendant a $37,500 credit on his American Express account. Rather than retain that money for restitution as agreed, the defendant spent much of the money by giving his attorneys in his divorce case a $10,000 retainer on November 13. He spent the rest when he gave his second set of divorce lawyers a $25,000 retainer 16 days later. It is unlikely that his first set of divorce attorneys spent down the entire $10,000 retainer he gave them but the defendant has never accounted for what remained of the $10,000, much less what remained of the $25,000 retainer after the defendant went *pro se* in his divorce case. The victims will never see a dime of the $37,500 that could have

gone toward restitution.  The defendant's needs were apparently more important to him.

This incident is not surprising.  As the Probation Office observed in the PSR, the defendant's primary thoughts since his arrest have been about himself and how he could minimize the damage to his own life.  Immediately upon his arrest and in between his repeated claims that he is "actually a really good person," he proposed calling his victims in an effort to convince them to drop the charges.  It is difficult to imagine what truthful statements he could have made to his victims that he thought would be persuasive.

The defendant's present motion papers show his narcissistic nature is still there.  For example, he still argues that he is a victim of addiction, repeatedly invokes his child in an effort to gain sympathy for himself, and regards himself as "a resource for all of our Spanish-speaking inmates - someone with whom to share their grievances, and from whom to receive general advice."  Def. Mot. at 5.

The defendant's recent actions raise further questions about his commitment to "re-earn [his victims'] trust."  Def. Mot. at 4-5.  He recently filed for Chapter 7 bankruptcy in the Eastern District of New York in what may be an effort to discharge his $22 million restitution obligation.  *In re Scronic,* Case No. 1-20-43401 (E.D.N.Y. Bankr.).  The defendant's

19

$22 million restitution obligation is currently listed on the docket as a "[c]laim[] scheduled to be discharged without payment."[7]

      3.    Need for the Sentence Imposed to Promote Respect For the Law and to Afford Adequate Deterrence

The need for general deterrence of investment frauds is just as acute as it was when the Court sentenced the defendant.  The financial markets are dependent on reliable and transparent information about investments.  More than $70 trillion in assets were professionally managed for fees worldwide in 2015.  *See* www.agefi.fr/sites/agefi.fr/files /fichiers/2016/07/bcg-doubling-down-on-data-july-2016_tcm80- 2113701.pdf at 5.  The managers of that money have near exclusive control over information regarding those assets and investors place a great deal of trust in the managers to provide accurate information about their investments.  The financial industry, which ultimately distributes capital to where it can be used most efficiently, cannot work without that trust and the world's economy cannot prosper without efficient access to capital.  That capital will not be forthcoming from investors if they believe they cannot trust the information they are getting

---

[7] The Government is appearing in this case to ensure that the restitution obligation is not discharged.

about their investments.[8]  The need for general deterrence from frauds in the financial industry in this case is readily apparent.

That need for general deterrence is particularly acute with Ponzi schemes, which show no sign of abating.  Since 2012, an average of 65 Ponzi schemes a year are discovered, with a median scheme size of approximately $6 million.  "Investors Beware:  The Ponzi Scheme is Thriving," *Financial Times*, March 30, 2017.  As this case has demonstrated, even sophisticated, well-educated investors can be victims of such schemes which, by definition, will always eventually lead to investor losses.  Operators of Ponzi schemes generally are risk-takers and a Guidelines sentence here and in other similar cases is necessary to help deter such schemes in the future.

4.  Need for the Sentence
    To Provide Just Punishment

Justice required a substantial sentence in this case at the time of sentencing and that has not changed.  While the defendant's offense alone is worthy of substantial punishment,

---

[8] The events of 2002 demonstrated that investors' loss of confidence in the integrity of information about investments makes raising capital more difficult.  A. Berenson, "Week in Review," *New York Times*, February 10, 2002 ("If investors cannot believe the figures put out by public companies, they will be less willing to risk their money on stocks"); E. Iwata, "Enron's Legacy:  Scandal Marked Turning Point," *USA Today*, January 29, 2006 (accounting scandals at Enron, Worldcom and other issuers "shook investors' confidence and made it harder for companies to raise capital"); J. Castellano, "Restoring Public Confidence," *Journal of Accountancy*, April 2002 ("The public's confidence has clearly been shaken").

his narcissistic personality and his lack of remorse were, and still are, aggravating factors that serve as additional justification for the Court's sentence.

The Section 3553(a) factors weigh against any reduction in sentence.  Releasing this defendant from punishment for his serious offense would not promote respect for the law.

<u>CONCLUSION</u>

When the defendant initially moved for compassionate release in April 2020, the Court correctly noted that he "does not appear to be a promising candidate for compassionate release."  Nothing has changed in seven months.  For the reasons stated above, the Government submits that the defendant's motion for a sentence reduction be denied.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By: <u>/s/_____</u>
JAMES MCMAHON
DANIEL LOSS
Assistant United States Attorneys

Dated:    November 17, 2020
          White Plains, New York

cc:  Michael Scronic
       (by email)